UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| ----------------------------------------------X : | |
| KIM PAYTON-FERNANDEZ, : | Case No.: 1:22-cv-00608-NLH-AMD |
| LAVERN COLEMAN, and DARNIEL : | |
| WILLIAMS, Individually and on : | |
| Behalf of All Other Persons Similarly : | |
| Situated, : | |
| : | |
| Plaintiffs, : | |
| : | |
| -against- : | |
| : | |
| BURLINGTON STORES, INC., : | |
| BURLINGTON COAT FACTORY : | |
| WAREHOUSE CORPORATION, : | |
| BURLINGTON COAT FACTORY : | |
| INVESTMENT HOLDINGS, INC., : | |
| and BURLINGTON COAT : | |
| FACTORY HOLDINGS, INC., : | |
| : | |
| Defendants. : | |
| ----------------------------------------------X : | |

**DECLARATION OF MICHAEL A. GALPERN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF COLLECTIVE ACTION SETTLEMENT AGREEMENT AND RELEASE**

MICHAEL A. GALPERN, an attorney admitted to the bar of this Court, declares, under penalty of perjury that:

1.  I am a partner in Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins ("Javerbaum") and co-counsel for Plaintiffs Kim Payton-Fernandez, Lavern Coleman, and Darniel Williams ("Plaintiffs"). I am fully familiar with the facts and circumstances set forth herein, and I make this Declaration in support of Plaintiffs'

Unopposed Motion for Approval of Collective Action Settlement Agreement and Release, which seeks an Order (i) approving the proposed Settlement Agreement and Release ("Settlement"), attached hereto as Exhibit A, and, in connection thereto; (ii) conditionally certifying the proposed FLSA Collective, for settlement purposes only, under 28 U.S.C. 216(b); (iii) approving the expense and fee request; (iv) approving the service awards for the three named Plaintiffs; and (v) approving payment of the Settlement Administrator's costs.  A Proposed Approval Order is attached hereto as Exhibit B.

2. Defendants (collectively referred to herein as "Burlington") operate a nationwide off-price retail chain in 44 states across the United States.  As part of its operations, Burlington employs Assistant Store Managers ("ASMs") and, until February 28, 2021, classified them as exempt under the FLSA and state labor laws and therefore did not pay them for overtime hours worked above 40 in a workweek.  Plaintiffs allege that they and Burlington's other ASMs were misclassified as exempt under the FLSA prior to the spring of 2021.

3. This case follows upon the *Goodman/Kawa* actions whose joint settlement was reached after nine years of litigation and after the Honorable Joseph Rodriguez and the Honorable Joel Schneider spent numerous hours each presiding over the related cases. *See Goodman v. Burlington Coat Factory Warehouse Corporation, et al.*, Case No. 11-cv-4395 (D.N.J.) ("*Goodman*"); *Kawa, et al. v.*

*Burlington Stores, Inc., et al.,* Case No. 14-cv-2787 (D.N.J.)("*Kawa*"). *Goodman* had been commenced in 2011 and extensively litigated: from the certification of the collective action in November 2012; to 580 additional ASMs joining the collective following notice; through extensive discovery, including expert discovery; to Plaintiffs' motion to exclude Defendant's expert pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (2000) (Dkt 338) ("*Daubert Motion*"), which was extensively briefed and on which the Court held four days of hearings; to cross-motions for final certification and decertification, that addressed, at length, what Burlington ASMs did (or did not do) on the job, and which were extensively briefed and also argued at hearings before the Court.

4.  Following the hearings and argument, in decisions issued on September 16, 2019, and November 20, 2019, the Court, per Judge Rodriguez, granted in part and denied in part Plaintiff's *Daubert* motion, granted Plaintiff's motion for final certification of the collective, and denied Burlington's motion to decertify. *See Goodman v. Burlington Coat Factory*, No. 11-cv-4395, 2019 U.S. Dist. LEXIS 161162 (D.N.J. Sept. 20, 2019) (*Daubert*); *Goodman v. Burlington Coat Factory*, No. 11-cv-4395, 2019 U.S. Dist. LEXIS 223588 (D.N.J. Nov. 20, 2019) (final certification and decertification).  To all intents and purposes, *Goodman* was ready to proceed to pre-trial planning and a trial on whether the work that ASMs did constituted exempt or non-exempt employment.

5. In total, the *Goodman* merits discovery included 28 opt-in depositions taken across the country, seven depositions of Burlington corporate witnesses, and multiple sets of written discovery that resulted in over a half million pages of documents produced by Burlington that were reviewed by Plaintiffs' counsel. The expert side of *Goodman* entailed detailed expert reports on the issues relevant to whether Burlington improperly classified ASMs as exempt under the FLSA, which were followed by expert depositions.

6. With the advent of the COVID pandemic in the spring of 2020, the Parties, under the urging of Magistrate Judge Schneider, agreed to mediate the *Goodman*/*Kawa* cases. Using the same nationally prominent mediator who mediated this case, David Geronemus of JAMS, a $19.6 million settlement was reached, which was approved by Judge Schneider on December 15, 2020.

7. Importantly, however, the *Goodman*/*Kawa* settlement only encompassed 1,648 Burlington ASMs who either i) had opted into the *Goodman* case, or ii) (in *Kawa*) were residents of New York, California, and Illinois. The notice in *Goodman* was sent to the putative collective in 2013, over seven years before the case eventually settled, so nobody hired into the assistant manager position post-2013 received a notice to opt into that case. *Goodman* pertained to FLSA claims; it was settled together with *Kawa*, which asserted Rule 23 class

claims on behalf of individuals in New York, California, and Illinois under those state's wage and hour laws.

8.  Also importantly, after the *Goodman* case was commenced, in 2014, Burlington initiated a dispute resolution program called "STEPS" ("Steps To Effective Problem Solving") which required arbitration for disputed employee claims and which also had a class/collective waiver. Burlington was unable to invoke STEPS in *Goodman* because of the older timing of the claims in the case, but did so in this case.  While Plaintiffs believed that under New Jersey caselaw they had significant arguments to challenge the validity of STEPS, this arbitration provision, which also had a class/collective waiver can (and routinely does) constitute a death knell for class or collective lawsuits. STEPS, therefore, presented a substantial hurdle to this case.

9.  For those that opted into the prior *Burlington* case or who were members of the State law classes in the *Kawa* case, the release date was August 20, 2020.  Nevertheless, as of that date, Burlington continued to classify ASMs as exempt and continued not to pay them overtime for hours over 40 worked in a work week until February 28, 2021, when it reclassified the ASM position to be an hourly position with overtime.  As a result, a great many ASMs never had claims released because they had neither joined the *Goodman* collective action nor worked in the three *Kawa* states.

5

10. Accordingly, in late 2021, the original named Plaintiff, Ms. Payton-Fernandez, reached out to counsel because she believed she possessed meritorious misclassification claims for the period prior to February 28, 2021, and, after further investigation and research, this case was commenced on February 4, 2022. Two other ASMs, Opt-in Plaintiffs Lavern Coleman and Darniel Williams, soon joined the case. Part of the preparation for the filing of this case also involved reaching out to former clients from *Goodman*, researching and preparing the complaint and also a motion for FLSA notice and conditional certification. Two months after the case was filed, on April 8, 2022, Plaintiff filed such a notice and conditional certification motion seeking a nationwide FLSA Burlington ASM collective that would extend through the date that Burlington had reclassified ASMs as non-exempt and that would either include employment three years prior or August 20, 2020, depending on whether they ASM was part of the *Burlington/Kawa* settlement or not. ECF Docket No. 12. That same day, Burlington filed a motion to compel Ms. Payton-Fernandez to arbitrate her claims. ECF Docket No. 10.

11. While the parties were respectively preparing to respond to the two motions, Burlington approached Plaintiff's counsel to discuss a potential mediation of the claims. Both sides were well aware of the issues presented; both sides fulsomely knew the record developed in *Goodman* and the rulings in that case; and both sides were aware of how the company had reclassified the position. That

6

Plaintiffs were prepared to litigate doggedly on all the issues presented, including, as noted, the validity of the STEPS arbitration provision and Burlington's invocation of it. Burlington's position was also clear that, following the 2020 *Goodman* settlement, the ASM position had changed in a manner to justify the classification as exempt from overtime. To Plaintiffs and their counsel, the opportunity to obtain an expeditious resolution for Plaintiffs and other Burlington ASMs – particularly compared to the nine years of *Goodman* litigation – made the prospect of mediation worthwhile.

12. The parties agreed, as noted, to use the same mediator as they used in 2020, David Geronemus. In preparation for the mediation, Burlington provided more detail about what it might claim in this case about why its arbitration program and its collective action bar was enforceable, and its basis for claiming that the ASM position changed in their favor since the last settlement. In advance of the mediation, it also provided week-by-week payroll information for all members of the putative FLSA collective that included, which is unusual for a misclassification case such as this, the amount of overtime each worked each week during the relevant period. Plaintiffs' counsel asked multiple questions of Burlington to develop a damages/exposure model against which the mediation could take place. Both sides exchanged mediation statements and the mediation took place over Zoom on July 12, 2022. After a full day of extensive back-and-

7

forth, that evening an agreement in principle was reached and committed to writing in a term sheet.

13. The proposed Settlement is an $11 million resolution. The $11 million will provide for payments to the proposed Potential Collective Members, as well as cover the incentive awards and attorneys' fees and costs that are herein requested to be approved. It also will provide for a "PAGA" payment to the California Labor and Workforce Development Agency ("LWDA"), and cover the costs of the settlement administrator. In contrast to some class action settlements, rather than having Potential Collective Members submit claim forms, it provides for direct and immediate delivery of checks. *Id.* The checks will contain and constitute FLSA releases that are only effective if the Collective Member cashes or deposits the check. The Maximum Settlement Amount is all-in with the exception that Burlington will be responsible for the employer share of payroll taxes on the 50% of Settlement Payments cashed or deposited attributable to wages. In addition, pursuant to common FLSA practice, the value of any uncashed checks will revert to Burlington because, otherwise, Burlington will not (unlike a Rule 23 class action) get a release of the FLSA claims. PAGA stands for California's "Private Attorneys General Act", which is a civil penalties provision under California law. Cal. Lab. Code §2698 *et seq*. The Settlement allocates $15,000 (the "PAGA Payment") to resolve PAGA claims, of which 75% ($11,250) will be

allocated to California's Labor and Workforce Development Agency ("LWDA") and 25% ($3,750) will be allocated to the Collective and Settlement Class Members from California pursuant to PAGA.

    14.    There are also the following Settlement terms:

1. 50 percent of the Settlement Payments shall be allocated as wages and 50 percent shall be allocated as liquidated damages, penalties, and interest in light of the claims asserted. It is intended that the amount treated as wages shall be subject to regular withholding and deductions for which, at the appropriate time, an IRS Form W-2 shall issue. For that amount treated as liquidated damages, penalties and/or interest, there shall be no withholding or deductions, and, at the appropriate time, an IRS Form 1099 shall issue.

2. In return for the consideration provided under the Settlement, and by choosing to cash the Settlement checks, the Potential Collective Members, including their heirs, agents, representatives, successors, assigns and estates shall release, any and all wage and hour claims, rights, and causes of action, whether known or unknown, under any federal, state, or local wage and hour law, including but not limited to the Fair Labor Standards Act, including without limitation statutory, constitutional, contractual, and common law claims for wages, damages, penalties, attorneys' fees, restitution, or equitable relief to the extent relating to or deriving from a wage and hour claim (including claims for overtime wages or any other wages) relating to their Burlington employment.

3. Subject to Court approval, Plaintiffs' Counsel can request up to 30% of the Maximum Settlement Amount as attorneys' fees and their reasonable actual costs.

4. Subject to Court approval, service awards ("Separate Awards") of up to $10,000 each for a total of $30,000 shall be paid from the Maximum Settlement Amount to named Plaintiffs Kim Payton-Fernandez, Lavern Coleman, and Darnel Williams.

15. Using the week-by-week payroll data supplied by Burlington, Plaintiffs' counsel has determined that at either a half-time rate *or* at a "regular" rate analysis, the *maximum* recovery for the overtime alleged in the would have been either $9.62 million (FWW) or $16.8 (regular rate), respectively, on an unliquidated basis. Thus, even assuming Plaintiffs prevailed on the threshold arbitration issue, an $11 million recovery against a range from a likely $9.62 to $16.8 million (or even twice those numbers assuming Plaintiffs could prove that Burlington had willfully violated the FLSA to obtain liquidated damages), represents a recovery of from 114% to 65.4%, (or even 57% to 37.7%, liquidated). We would respectfully submit that this most certainly constitutes a fair and reasonable result, particularly given the risks presented by the case, at trial, post-trial and the time attendant upon getting any result.

16. Altogether, Plaintiffs' counsel's thorough assessment of the risks is that the Settlement constitutes a "fair and reasonable" result.

17. With expenses of approximately $18,443.12. this means that the fee request of $3,281,556.88, will be 29.8%, which represents approximately a ten percent discount from the retainer agreements to which each of the Named Plaintiffs signed with Plaintiffs' counsel and a diminution from the usual one third (or more) *plus* expenses that are usually awarded in FLSA settlement.

18. Plaintiffs' counsel are exceedingly experienced in similar class and collective actions and have a nationwide reputation for prosecuting wage and hour misclassification lawsuits, including, as discussed, even trying this Court's and the Third Circuit's leading trial, *Stillman v. Staples*, as well as having obtained many hundreds of millions of dollars in recoveries for managerial misclassification claims for tens of thousands of other clients.  A copy of the firm resume for Plaintiffs' counsel Klafter Lesser is attached hereto as Exhibit C; a copy of the firm resume for Plaintiffs' counsel Javerbaum is attached hereto as Exhibit D.

19. Plaintiffs' Counsel undertook this action entirely on a contingent fee basis, assuming a substantial risk that they might not be compensated at all for their efforts, particularly since as many FLSA misclassification cases are lost at trial as are won and, in this instance, this case was commenced in the face of a known arbitration protocol.

20. In getting to this Settlement, from inception through the date of this filing, Plaintiffs' counsel – my firm and the Klafter Lesser LLP firm – have put in 615.30 hours of work and have a combined lodestar of $431,689.  Complete copies of the time records, which were contemporaneously recorded, can be provided upon request.  In addition, there is still significant work to be done that will be necessary to effectuate the administration of the Settlement and advise members regarding their Settlement payments, which is recognized as necessary and

compensable. The additional time that will be required to administer the Settlement in the future can be reasonably estimated to be at least another 150 hours for the 1,715 Potential Collective Members.  Conservatively estimated, and assuming, as experience has shown, that the majority of this time will be paralegal time with some associate time, this can be expected to be another $60,000 in lodestar. Accordingly, when this time is included, the time spent and likely to be spent represents a lodestar of $491,689.  The fee request, accordingly, would represent a multiplier of 6.67 (3,281,556.88/491,689), which we believe is well warranted given the result here and the speed with which the case resolved and is a multiplier within the range of other similar cases that resolved expeditiously.

21.    Further, with respect to the fee request, it should be noted that while this case itself was quickly resolved, there is no dispute that its resolution was driven by the fact that *Goodman* had consumed many years of advanced and thorough litigation.  To all intents and purposes this case was a final continuation and coda to that action, successfully resolving the claims that were not, as discussed, settled in that case, and while Plaintiffs' counsel had their fee approved there, the lodestar multiplier was just 1.55 – which for nine years of work essentially meant, given the lost time value, that Plaintiffs' counsel essentially only broke even on their time.  *See Goodman*, 11-cv-04395-JHR-JS, ECF No. 472-2 at 8 at ¶ 16, 9 at ¶ 20 (final approval declaration setting forth time and lodestar

analysis). As noted, the fee request represents a multiplier of 6.67 for the time in this action itself, but, in addition, we would submit that it is not unreasonable to view this and *Goodman* together, and to at least recognize some proportion of the *Goodman* time (which totaled approximately 7,000 hours for a lodestar of $4.211 million, *see id.*), which enabled Plaintiffs' counsel here to reach this Settlement at an early stage in the case. Considering only one-third of those hours and lodestar, Plaintiffs' combined lodestar would be $1.835 million and the total net lodestar multiplier here would then be 1.79, which is certainly not unreasonable (even assuming a lodestar cross-check was appropriate in a collective action settlement of this sort where each possible participating Potential Collective Member has the individual choice to accept the Settlement (or not) – in effect replicating the market for individual retainers which, in this case were 33%).

22. We would further respectfully submit that, as Plaintiffs' counsel, we did the right thing by our clients by agreeing forthrightly to mediate this case when Burlington approached us in April. At that point, we faced an alternative: either do the right thing by Potential Collective Members and agree then to mediate, or to commence the discovery we had prepared and challenge Burlington's arbitration protocols. The latter effort certainly could not have been faulted as unnecessary and it would have, at a minimum, provided time and lodestar that would unquestionably have been recouped at a premium in a delayed mediation. But in

agreeing to mediate this case and see how much we could obtain for their clients, we most respectfully submit that this Court should not penalize us for aligning their interests with their clients and then obtaining an excellent result for them. We believe it fair to say that having obtained a substantial Settlement, particularly when facing the Burlington arbitration provision, indicates an exceedingly high level of representation that this Court, in its discretion, should reward and not punish.

23. The expenses Plaintiffs' counsel incurred have totaled, as noted above, $18,443.12, the largest components of which were the mediation costs ($11,600), Pacer/Lexis expenses ($5,542.44), and Court and service fees ($1,247.76). Complete documentation of these incurred costs and expenses can be provided if the Court requests.

24. The Named Plaintiffs provided valuable information about their experiences working for Burlington, and made themselves available for consultation as the case was filed and proceeded. Among the valuable information they provided was information relevant to challenge Burlington's contention that its ASM position had changed since the period at issue in the prior cases. As a result of their willingness to bring these actions and step forward, 1,715 ASMs stand to be able to get their claims paid. Service awards are recognized as particularly appropriate in wage and hour cases. Each Named Plaintiff here faced

the risk of retaliation from within the retail industry—or at least the fear of such risk—by putting their name out there as Named Plaintiffs.

25. The Court should also approve the payment of up to $32,699 to JND Legal Administration for the costs of Settlement Administration, including the printing of the Notice and checks, mailing to Potential Collective Members, and dealing with replacement checks and remailings. This amount was a capped bid that JND provided and JND is a most experienced administrator; in fact, JND handled, without any problems, the *Goodman* settlement, and, in the experience and opinion of Plaintiffs' counsel, this amount is reasonable and typical of the costs for handling a FLSA settlement of this size.

26. As provided under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 21, 2022                         /s/ Michael A. Galpern
                                                  Michael A. Galpern