# KLAFTER|LESSER

Two International Drive • Suite 350 • Rye Brook, NY 10573
914-934-9200 • www.klafterlesser.com

November 7, 2024

**Via ECF**
The Honorable Ann Marie Donio, U.S.M.J.
United States District Court
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

> Re:    ***Payton-Fernandez v. Burlington Stores, Inc., et al.***
>          **Case No.: 1:22-cv-00608 (AMD)**

Dear Judge Donio:

Plaintiffs submit this Supplemental Submission, as directed by the Court in its October 28, 2024, Order (ECF #109, "Order"), to provide additional support for Plaintiffs' motion for approval of collective action settlement and for an award of attorneys' fees and service payments (ECF #104). We hope this submission fully addresses the points raised by the Court in its Order.

## PRELIMINARY STATEMENT

As the Third Circuit has often stated,[1] Courts favor the settlement of class/collective actions, and for the reasons set forth in Plaintiffs' prior submissions, the proposed Settlement is an excellent one that, if approved, would provide substantial benefits to the Opt-Ins in this case.

To provide further support for approval the Parties have agreed to certain modifications of the Settlement Agreement, as reflected in the Rider submitted as Exhibit A hereto, which we believe should remove any issue as to some of the points raised by the Court. Specifically:

1.   The Parties have stipulated, for settlement purposes to final certification of the collective. *See* ECF #109 at 4-6 (raising point). Plaintiffs submit that this eliminates any impediment to this Court's consideration of the merits of the Settlement. *See* page 5, below.

---

[1] "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Oliver v. BMW of N. Am., LLC,* 2021 U.S. Dist. LEXIS 43290, *9 (D.N.J. Mar. 8, 2021) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)). As such, "there is an overriding public interest in settling class action litigation, and it should therefore be encouraged." *McDonough v. Horizon Blue Cross Blue Shield of N.J.*, 641 F. App'x 146, 150 (3d Cir. 2015) (quoting *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir. 2004); *see also Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts.").

NEW YORK • NEW JERSEY • WASHINGTON, DC

Hon. Anne Marie Donio
November 7, 2024
Page 2 of 21

2.  The Parties have agreed to eliminate the reverter as to uncashed checks (*see* Order at 10-12 (raising point)), and agreed that if there are any remaining uncashed or undeposited checks after reasonable efforts have been made to have Opt-Ins cash or deposit their checks, any such funds will be redistributed to those Opt-Ins who did cash or deposit their checks, to the extent they would receive at least $20.00.

3.  The Parties have eliminated the relationship between the Service Awards and the general release, so Plaintiffs believe there is no longer any basis for not approving the requested Service Awards. The amended Settlement Agreement now provides for a mutual release by both the Named Plaintiffs and the Defendant. The mutuality of the general releases provides the consideration for the Named Plaintiffs' General Release and such mutual releases have been judicially approved.

Below, we address the other issues raised by the Court regarding approval of the Settlement. In summary:

*First*, as was directed by the Court (Order at 7-8), at pages 3-4 and at 19-20, below, Plaintiffs set forth more detail as to the settlement negotiations, including addressing the Court's implicit inquiry (Order at 3 n.1) as to how the average settlement amounts that were reached in the negotiations for this Settlement compared to the originally proposed settlement, and also provide at pages 5-11 a more expansive discussion of how the Settlement meets each of the *Girsch* factors.

*Second*, with respect to attorneys' fees (Order at 9-10), at pages 11-18, we set forth a more detailed analysis of the reasonableness of our hourly rates here, which Plaintiffs believe is only relevant to a cross-check analysis in connection with a request for a common fund fee award. We set forth (1) more detail concerning our firms' usual and customary rates and also how they have supported requests for common fund fee awards by courts in this District; and (2) how the hourly rates of our firms are reasonable and within the range charged by plaintiff lawyers who do complex contingency fee work within this District and this Vicinage, particularly with respect to class and collective actions, including the submission of six declarations from lawyers who prosecute various types of class/collective cases, as well as FLSA wage and hour cases specifically.

*Third*, as discussed on page 18, below, there is no longer a reverter in the Settlement that returns the value of uncashed checks to Defendant. Instead, any such unclaimed funds will be redistributed to other Opt-Ins. This, we believe, addresses the Court's concern that uncashed checks could reduce the total award ultimately received by the Plaintiffs and the Collective. And, as well, since there will be no potential reduction in the amount made available to Plaintiffs and the Collective, the Court need not reserve any determination as to the amount or timing of an attorney fee award here. *See* Order at 10-12 (raising this point).

*Fourth*, Plaintiffs also show, at pages 18-20 why the "clear sailing" provision in the Settlement Agreement should not raise any concerns that the settlement was the product of any collusion. The settlement negotiations here were paradigmatic arms-length settlement negotiation under the guidance of a respected third-party mediator in which the sole focus of Plaintiffs' counsel during the settlement negotiations was to maximize the common fund, and at no time (either during

Hon. Anne Marie Donio
November 7, 2024
Page 3 of 21

or after) was there any negotiation as to the amount of attorneys' fees. Indeed, all Parties understood that they were negotiating an all-in settlement from which Plaintiffs would seek their attorneys on a percentage basis. The "clear sailing" provision was just a carry-over from the *Goodman* settlement. Under these facts, there could not have been any explicit or implicit trade-off of the collective's interests for counsel's interests, which is the concern behind clear sailing agreements. Inasmuch as the attorney fees would be paid from the common fund, neither they nor the clear sailing provision provide any indicia that the interests of the Plaintiffs and Opt-Ins were compromised. The attorneys who spent considerable time litigating this case and negotiating this arm's-length Settlement collectively have years of extensive legal experience and unblemished legal reputations. Any suggestion that there was some form of collusion is categorically wrong.

*Lastly*, at pages 20-21, Plaintiffs demonstrate why the requested Service Awards should be approved as they are no longer consideration for the General Release and why the mutual General Releases included in the amended Settlement Agreement should be approved.[2]

## DISCUSSION

I.    *The Settlement is the Product of Arms-Length Negotiations*

In late 2021, Ms. Peyton-Fernandez, an individual who had been a Burlington Assistant Store Manager ("ASM") and was not included *Goodman v. Burlington Coat Factory Warehouse Corporation, et al.*, Case No. 11- cv-4395 (D.N.J.) ("*Goodman*"), settlement, approached Plaintiffs' counsel to see if she could assert the same claims as the *Goodman* plaintiffs on her behalf because she believed she, too, had been misclassified. Lesser Dec. (ECF #104-2) ¶ 9. After filing the action, Plaintiffs quickly moved for conditional certification and Burlington, in turn, countered with a motion to compel arbitration. *Id.* By the time the present complaint was prepared and filed, Burlington, which had reclassified ASMs as non-exempt (*id.* at ¶ 8), wished to put its issue of classification of ASMs behind it and not to have to engage again in the dogged, prolonged, and costly litigation that led to the *Goodman* settlement. (This Court might recall that the Goodman case expanded 9 years and 4+ months from the time of first filing until final approval). Accordingly, after filing its motion to compel arbitration, Burlington approached Plaintiffs' counsel to discuss whether settlement could be reached with the assistance of the same seasoned mediator who facilitated the settlement in *Goodman*, Mr. David Geronemus at JAMs. *Id.* at ¶¶ 11-12. Plaintiffs' counsel, in turn, having litigated *Goodman* for many years were fully aware of the claims and defenses presented and knew that the policies and procedures applicable to the claims had not changed, and also having obtained final pre-trial certification of the case, recognized that a resolution on behalf of those ASMs who had not been part of the *Goodman* settlement could avoid re-litigation of scores of issues that had been previously addressed and avoid the not-insignificant risk posed by Burlington's arbitration clause which could have sank the possibility of this case proceeding.[3] *Id.* at ¶ 11.

---

[2] Plaintiffs also hereby submit, as Exhibit B, hereto, a revised proposed Final Judgement that adds a provision authorizing the creation of a QSF. *See* Order at 15.

[3] Individual arbitrations of mid-manager misclassification claims are quite rare as economically impracticable. Indeed, mid-manager misclassification cases have diminished substantially in

Hon. Anne Marie Donio
November 7, 2024
Page 4 of 21

That mediation took place in July 2022 and after a full day of mediation, led to an agreement to settle this action on behalf of 1,715 Burlington ASMs for $11 million, which were all of the ASMs who had timely claims. Then, as with the present Settlement, the result was an excellent one for the putative settlement ASMs: the $6,000+ average gross settlement amount representing a recovery of 65.4% to 114% of potential maximum unliquidated damages (or 37.7% to 57%, including liquidated damages, *see* Lesser Dec. (ECF# 104) at ¶13 – and as the Court assuredly is aware, recoveries of this percentage of maximum damages are rare in class actions. In addition to analyzing and evaluating the facts of the claims and the legal strengths and weaknesses of those claims in light of counsel's knowledge of the case, particularly as informed by the development of the record, extensive briefings and Court rulings in the prior *Goodman* case, the settlement amount was driven by an analysis of Burlington's time records, which reflected the actual amount of ASM collective overtime during the relevant periods. Lesser Supplemental Declaration ("Lesser Supp.") (Ex. C) ¶ 3. After this Court rejected that proposed Settlement and required Plaintiffs to move for conditional certification, the Parties' belief in the value of the original settlement remained unchanged inasmuch as the original $11 million number had been a mediated and extensively negotiated number. Accordingly, for purposes of the present Settlement, the Parties applied the same value for working overtime hours negotiated previously and then applied it to the 838 Opt-Ins which led to a new total number of $5,130,565.21. Lesser Supp. Dec. ¶ 4. In other words, the value of this Settlement for each Opt-In who joined the collective was the same as before. However, Plaintiffs then got Burlington to agree to round that amount up to $5.2 million, which actually improved the result for those who opted-in as compared to the original settlement. This Court has questioned why the average recovery is a bit lower (Order at 3 n.1), but the simple reason for that is that the amount of overtime of those who opted-in is slightly less than the average overtime of all the Burlington ASMs the original settlement would have covered. *Id.* at ¶ 5. The difference therefore does not indicate that the present Settlement is of less value per Opt-In; rather, as noted, with the round up, it is more. *Id.*

## II.    *Final Certification is Warranted*

Rather than continue to address the issue of whether final certification is required for a collective settlement to be approved (*see* Order at 5), by their Rider to the Settlement Agreement, the Parties have stipulated, for settlement purposes only, to final certification of the collective consisting of the 838 named and Opt-In Plaintiffs. Final certification is warranted for the same

---

recent years given arbitration clauses, a matter to which the undersigned can attest, and are cases which the Klafter Lesser firm does not bring, Lesser Supp. Dec. ¶ 13, and which is concurred in by the accompanying declarations of Shanon Carson, Esq. (Ex. D hereto) at ¶ 9 ("Such clauses have rendered many managerial misclassification cases impractical or not feasible to bring on a mass basis and often preclude most affected employees from obtaining any recovery."), and Stephen DeNittis, Esq. (Ex. F hereto) at ¶ 12 ("arbitrations of mid-manager misclassifications cases are extraordinarily difficult. In fact, many firms within the field are unwilling to do cases similar to this case. Mid-manager misclassification cases in recent years have diminished substantially and the result obtained here is, in my professional opinion, appears to be an exceedingly favorable one for over 800 employees."), both of whom practice in the FLSA wage and hour context. *See also* pp. 10-11, below.

Hon. Anne Marie Donio
November 7, 2024
Page 5 of 21

reasons this Court determined that conditional certification was appropriate as for all potential Opt-Ins (ECF #54), and because of the granting of final certification by the *Goodman* Court of essentially the same collective following extensive evidentiary proceedings. *See Goodman v. Burlington Coat Factory*, No. 11-cv-4395, 2019 U.S. Dist. LEXIS 223588 (D.N.J. Nov. 20, 2019) (final certification decision); *see also* Lesser Dec. (ECF #140-2) at ¶ 3-6. There is therefore no obstacle to considering the merits of the proposed Settlement.

III.    *The Girsch Factors Have Been Satisfied, thus Supporting Approval of the Settlement*

The Court has requested supplemental briefing regarding the fairness of the proposed settlement. Order at 7-8. Specifically, the Court has directed Plaintiffs to provide a delineated analysis of each of the nine *Girsh* factors that a court within this circuit should consider when determining whether a proposed settlement is fair and reasonable – as articulated in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975). The *Girsh* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh,* 521 F.2d at 157.

Analysis of the nine *Girsh* factors in this instance clearly supports approval of the settlement:[4]

*Girsh* Factor 1 (Complexity, Expense and Likely Duration of the Litigation). The first "factor captures the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted); *McGowan v. CFG Health Network, LLC,* 2024 U.S. Dist. LEXIS 60062, *22-23 (D.N.J. March 28, 2024). Absent this settlement, the road ahead promised litigation that would be complex, expensive, and time-consuming. Lesser Supp. Dec. ¶ 5. This is not a theoretical argument; Plaintiffs' counsel here lived through nearly a decade of the *Goodman* case against this same Defendant. As demonstrated by *Goodman*, and as oft-repeated in counsels' experience litigating numerous similar cases, a large collective FLSA misclassification action such as this demands massive amounts of discovery and briefing and consumes significant judicial resources. Assuming that Plaintiffs in this case were able to survive the potential challenge to this case presented by Burlington's arbitration defense (*see* discussion of *Girsh* Factor 6, below), should settlement here not be approved, litigation would have required dozens of potential depositions of Burlington witnesses and a sampling of Opt-Ins – located across the country – extensive written discovery; likely expert testimony, as there was in *Goodman*, bearing on the classification issue at the heart of this case; and multiple rounds of dense, fact-driven briefing synthesizing all of the fact and

---

[4] Some of the points made herein were previously made in ECF #104-1 (Plaintiffs' memorandum in support of the proposed settlement) ("Pls. Memo.") and ECF #104-2 (Lesser Declaration), but are repeated herein for the ease of reference.

Hon. Anne Marie Donio
November 7, 2024
Page 6 of 21

expert testimony, including final certification/decertification briefing and then, most likely, pre-trial briefing. Lesser Supp. Dec. ¶ 9. Indeed, a review of the *Goodman* docket alone demonstrates the extent to which that case involved extensive briefing, many of which consumed hundreds of pages; disputes over multiple discovery issues; and several days of hearings and argument on issues such as final certification/decertification, the admissibility under *Daubert* of complicated expert testimony, and the like. *See Goodman*, *supra*, No. 11-cv-04395-JHR-JS, at ECF #37 – ECF #451. Barring a "courthouse steps" settlement, as in *Goodman*, the Parties would then face a lengthy and expensive trial that would include the issue never adjudicated in *Goodman* – whether Burlington ASMs were misclassified as exempt from overtime; indeed, the leading managerial misclassification collective action trial of which we are aware in this Court, Plaintiffs' counsel's trial in *Stillman v. Staples, Inc.*, No. 07-849 (KSH), consumed six weeks. Lesser Supp. Dec. ¶ 9. And any trial result would likely be subject to appeals. All of this would likely take years, certainly would be costly, and consume significant attorney and judicial resources.

Accordingly, the first *Girsh* factor counsels in favor of approval because the Settlement Agreement obviates the expense, time and complicated process that would result from the prolonged litigation that would ensue absent this settlement, which could result in a lower or no recovery for plaintiffs. *See Hegab v. Family Dollar Stores, Inc.*, 2015 U.S. Dist. LEXIS 28570, *19 (D.N.J. March 9, 2015) (managerial misclassification case finding first *Girsh* factor met because to litigate such a case on a class basis meant that "significant time, effort, and expense would be incurred to resolve discovery disputes, brief dispositive motions and a motion to certify the class, prepare for and complete trial, submit post-trial submissions, and pursue likely appeals. By reaching a settlement, the parties have avoided the significant expenses connected with these steps. Lastly, the settlement provides immediate and substantial benefits for the settlement class."); *see also, e.g., In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (concluding that the first *Girsh* factor supported approval of a settlement because it would prevent prolonged litigation that could reduce any recovery for the class); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 535-36 (3d Cir. 2004) (finding that the first *Girsh* factor weighed in favor of settlement because "continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial").

<u>*Girsh* Factor 2 (Reaction of the Class to the Settlement).</u> Promptly following execution of the Settlement Agreement, Plaintiffs' counsel notified all of Opt-Ins of the terms of the proposed settlement, which included an estimate of the amount of money they would receive from the settlement, informed them of the requested attorneys' fees and cost reimbursements included in the proposed settlement, and invited all to submit any questions, comments, objections they may have and to indicate whether they wanted to participate in the Settlement, if approved by the Court. Lesser Supp. Dec. ¶ 12. While this was a matter of communication with clients by Plaintiffs' counsel and not a settlement notice, the point is that to date, not one Opt-In has indicated they do not want to participate in the proposed Settlement or voiced any issue with it (*id.*), and it "is generally assumed that 'silence constitutes tacit consent to the agreement.'" *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 85 (D.N.J. 2001) (*quoting Girsh*, 521 F.2d at 157). On the other hand, Plaintiffs' counsel receives nearly daily inquiries from Opt-Ins asking

Hon. Anne Marie Donio
November 7, 2024
Page 7 of 21

whether the Settlement has been approved and when checks will be delivered, and this is another supportive data point as to this factor. Lesser Supp. Dec. ¶ 12.

_Girsh_ Factor 3 (Stage of the Proceedings and the Amount of Discovery Completed). This factor addresses "whether counsel had an adequate appreciation of the merits of the case before negotiating." _In re Cendant Litig._, 264 F.3d 201, 235 (3d Cir. 2001); _see also Warfarin._, 391 F.3d at 537. Here, the proposed settlement was the result of arms-length bargaining conducted over a number of contested issues with the assistance of an experienced and well-regarded mediator. In light of the history in _Goodman_, which involved the same Plaintiffs' counsel as in this case and which addressed in great depth the same underlying claims and facts as this case, and with the additional help of Plaintiffs here – who not only further corroborated what was already known from _Goodman_, but confirmed that the same practices and indicia of misclassification continued post-_Goodman_, a point that has been even more fully verified from Opt-ins – there can be no question that Plaintiffs' counsel possessed a full appreciation of the merits of this case and of Defendants' defenses, including their arbitration defense, when negotiating. Furthermore, as reflected in their respective firm resumes (_see_ ECF No. #104-2, Exhibits C and D), Plaintiffs' counsel has deep and broad experience in litigating wage and hour cases under the FLSA, including among other things taking the _Stillman v. Staples_ case to trial, and obtaining what we understand to be the two largest FLSA settlements in this Court (the ultimate _Staples_ settlement and the _Goodman/Kawa_ settlement) and multiple other large FLSA settlements, including the largest in the District of Rhode Island (_Nash v. CVS_, 09-cv-079 (D.R.I.) ($34 million settlement)), the Middle District of Pennsylvania (_Craig v. Rite Aid Corp._, 08-cv-2317 (M.D. Pa.) ($20.9 million settlement)), as well as the largest settlement in the District of Massachusetts (_Lapan v. Dick's Sporting Goods_, 13-cv-11390 (D. Mass.) ($10 million settlement)). _See also, e.g.,_ ECF #104-2 at ¶ 14. Plaintiffs' counsel thus reached the proposed settlement in this case from a well-informed position and based upon extensive experience in resolving disputes of this nature. _See In re Cendant Corp. Litig._, 264 F.3d at 236 (finding appreciation for merits despite settlement at an early stage of discovery). This factor supports approval of the settlement.

Girsh Factors 4 and 5 (Risk of Establishing Liability and Risk of Establishing Damages): These factors together "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement," _In re Warfarin Sodium Antitrust Litig._, 391 F.3d 516, 537 (3d Cir. 2004), and "examine the potential rewards (or downside) of the litigation had class counsel elected to litigate the claims rather than settle them." _In re: General Motors_, 55 F.3d 768, 814 (3d Cir. 1995). Continued litigation here would pose significant risks to Plaintiffs and to the Opt-Ins. Specifically, they might lose on the ultimate issue in this case – whether ASMs were misclassified -- at trial and recover nothing or, even if successful at trial, recover less than the value of the settlement, particularly if the Court holds that the "fluctuating workweek" measure of damages should apply. Lesser Supp. Dec. ¶ 10. Indeed, while, as noted, counsel for Plaintiffs has had success at trial in a FLSA misclassification suit in this District, many if not most FLSA misclassification trials have resulted in verdicts for the _employers_. Lesser Supp. Dec. ¶ 11. It can fairly be stated that a managerial misclassification case, such as this, presents a large number of "contingencies" that could have "impact[ed] Plaintiffs' possible recovery" including, for instance, "…proving willfulness in order to extend the statute of limitations by one year in order to obtain an additional year of damages under FLSA, and showing lack of good

Hon. Anne Marie Donio
November 7, 2024
Page 8 of 21

faith in order to get liquidated damages." *Roberts v. TJX Corp.*, 2016 U.S. Dist. LEXIS 136987, *27-28 (D. Mass. Sept. 30, 2016) (approving settlement in similar retail chain mid-manager misclassification case). Or, as Judge John Jones III said in approving another substantial FLSA retail chain store mid-level manager misclassification settlement, "[i]t is undisputed that copious risks abound with respect to maintaining this action and establishing liability." *Craig*, 2013 U.S. Dist. LEXIS 2658 at *38.[5] In contrast, this settlement offers "immediate and certain recovery" for Plaintiffs and collective members and "[i]n light of the uncertainty of success for both sides in this litigation and the certain, immediate benefit provided by the settlement" this factor supports approval of the settlement. *Hegab*, 2015 U.S. Dist. LEXIS 28570 at *19.

Regarding damages, as discussed in Plaintiffs' memorandum of law in support of the proposed settlement ("Pls. Memo") (ECF No. 104-1) at 18, Plaintiffs believe the settlement here is particularly excellent precisely because of the risk involved in establishing liability and the measure of damages to be applied. *See, e.g., Craig*, 2013 U.S. Dist. LEXIS 2658 at *38-39 (method of damage calculations was crucial unresolved issue that weighed in favor of wage and hour misclassification class settlement approval); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 462 (D.N.J. 2008) (that parties "insisted on vastly different methodologies for determining damages" favored settlement).

Here, the maximum possible recovery primarily presents a disputed issue of law that is unsettled in this Circuit as to how damages are calculated in misclassification cases: are they determined at a "Fluctuating Work Week" ("FWW") or half time for work over 40 hours damage rate, as has been accepted by all the federal Courts of Appeals that have addressed the issue,[6] and as one decision of this Court has agreed. *DePalma v. The Scotts Company LLC*, No. 13-7740 (KM) (JAD), 2019 U.S. Dist. LEXIS 97036 (D.N.J. June 10, 2019) or, are they determined at a "regular" rate analysis which provides for half time up to expected hours to be worked and then time and a half beyond that, as was utilized by Judge Schwartz in *Stillman v. Staples, Inc.*, No. 07-849 (KSH), 2009 U.S. Dist. LEXIS 42247 (D.N.J. May 15, 2009) (collective action plaintiffs' verdict). Plaintiffs' counsel has determined that the maximum recovery for the Opt-Ins, based on actual records of overtime hours worked, would have been approximately either $4.56 million (FWW) or $7.95 million (regular rate), on an unliquidated basis. *See* ECF No. 104-2 (Lesser Dec.) at ¶¶ 13-14. This proposed $5.2 million settlement therefore represents a recovery of 65.4% to 114% of potential maximum unliquidated damages (or even 37.7% to 57%, including liquidated damages) – most certainly a fair and reasonable result, particularly given the risks presented by the case. In light of what the Parties believe to be the high quality of the proposed settlement (as

---

[5] Note should also be made of the possibility of post-trial decertification, which has even occurred in FLSA misclassification cases, most notably in the well-known case in *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567 (E.D. La. 2008), where a retail store manager collective was decertified *after* trial.

[6] *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (applying half-time rate); *Urnikis-Negro v. Am. Family Prosperity Servs.*, 616 F.3d 665 (7th Cir. 2010) (same); *Clements v. Serco, Inc.*, 530 F.3d 1224 (10th Cir. 2008) (same); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35 (1st Cir. 1999) (same).

Hon. Anne Marie Donio
November 7, 2024
Page 9 of 21

further discussed immediately below regarding *Girsh* Factors 8 and 9), the potential "upside" to be obtained by continued litigation was deemed small in comparison to the substantial risk that such a course entailed. As such, both of these *Girsh* factors favor settlement.

     <u>*Girsh* Factor 6 (Risks of Maintaining the Class Through Trial)</u>:  Absent settlement, and had the case proceeded, and assuming that Plaintiffs did obtain conditional certification on a contested basis, Burlington could have further moved to "decertify" the collective following "second-stage discovery", and, if Burlington was successful, the claims of all Opt-Ins (but not Plaintiffs) would have been dismissed without prejudice. *See Halle v. West Penn Allegheny Health Sys.,* 842 F.3d 215, 227 (3d Cir. 2016). While Plaintiffs defeated such a motion in *Goodman*, no guarantee exists that such a result could be achieved again. Although the undersigned counsel might then seek to refile claims in court on an individual-by-individual base, the considerable advantages to trying the claims of all Opt-Ins Members in one proceeding based on representative testimony would be lost.

     But of course, even prior to any risk of decertification, Plaintiffs here faced the initial risk as to whether this case would be able to proceed at all, based on Burlington's potential defense that Plaintiffs and members of the collective are each subject to arbitration provisions that bar their participation in this collective action. As previously discussed (Pls. Mem. at 8-9), Burlington had initiated a dispute resolution program ("STEPS") which requires arbitration for disputed employee claims and which also has a class/collective action waiver. ECF 104-2 (Lesser Dec.) ¶¶ 10-11. Burlington was unable to invoke STEPS in the previous *Goodman* or *Kawa* cases because of the older timing of the claims in these cases, but Burlington was not barred from doing so in this case. While Plaintiffs believe that under New Jersey caselaw they have arguments to challenge the STEPS validity,[7] arbitration and collective action waiver provisions often present dire challenges to class and collective lawsuits. STEPS, therefore, not only presents a substantial hurdle to this case, but is a significant risk that this proposed settlement obviates. *Id.*

     <u>*Girsh* Factor 7 (Ability of Defendant to Withstand a Greater Judgment)</u>: This factor is deemed neutral where, as here, the risk of non-payment did not factor into plaintiffs' counsel's settlement analysis. *In re NFL Players Concussion Injury Litig,* 821 F.3d 410, 440 (3d Cir. 2016). Burlington's financial health and ability to withstand a greater judgment was not material to Plaintiffs' negotiations with Defendant. *See Galt v. Eagleville Hosp.*, 310 F. Supp. 3d 483, 495 (E.D. Pa. 2018) (concluding that the seventh *Girsh* factor was neutral because the parties did not present evidence concerning the defendant's ability to pay a greater judgment).

---

[7] Particularly, under *Leodori v. Cigna Corp.*, 175 N.J. 293 (2003), Plaintiffs would have argued in response to Burlington's motion to compel Plaintiffs to arbitrate that Burlington had only obtained an acknowledgment of receipt of the STEPS materials and therefore it did not obtain clear consent to arbitrate disputes or waive their collective action rights, as required by New Jersey law. Burlington would have challenged this position, but even if Plaintiffs prevailed under *Leodori*, the vast majority of the ASMs who worked in other States might not have been able to invoke New Jersey law, but rather been subject to the arbitration/collective action waiver law of the State in which they worked. The challenged issues were therefore, fairly stated, substantial.

Hon. Anne Marie Donio
November 7, 2024
Page 10 of 21

_Girsh_ Factors 8-9 (The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation): These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." _In re: Warfarin_, 391 F.3d at 538. The question is whether, in light of these risks, the settlement class is getting "good value." _Id._ Specifically, courts are to "compare the value of recovery to the plaintiffs should they proceed to trial, discounted by the risk of not prevailing, with the proposed settlement amount." _Craig_, 2013 U.S. Dist. LEXIS 2658 at *41.[8] These factors "are typically considered in tandem," and require the Court to "compare[] the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement." _Beltran v. JP Mgmt., LLC_, 2023 U.S. Dist. LEXIS 227037. *7 (D.N.J. July 28, 2023) (_quoting In re PAR Pharm. Secs. Litig._, 2013 U.S. Dist. LEXIS 106150, at *23 (D.N.J. July 29, 2013)). Here, Plaintiffs' counsel believes that the proposes settlement offers, unambiguously, "good value" to the Plaintiffs and Opt-Ins.

As previously discussed in Plaintiffs' memorandum of law in support of settlement, Plaintiffs' counsel has determined that the maximum recovery for the Opt-Ins, based on actual overtime hours worked, would have been approximately either $4.56 million (FWW) or $7.95 million (regular rate), on an unliquidated basis. _See_ ECF No. 104-2 (Lesser Dec.) at ¶ 13. As noted, this $5.2 million settlement therefore represents a recovery of 65.4% to 114% of potential maximum unliquidated damages (or even 37.7% to 57%, including liquidated damages) – most certainly a fair and reasonable result, particularly given the risks presented by the case. _Id._ Further, when viewed comparatively with other FLSA misclassification case settlements, the gross recovery here, is commensurate with, or even better than, many other mid-manager misclassification settlements approved by courts. _See_ ECF 104-2 (Lesser Dec.) at ¶ 14. Finally, while it far from the case here, courts in this District "recognize[] that settlement may be appropriate even where the settlement is only a fraction of the ultimate total exposure should the case be decided at trial." _Kress v. Fulton Bank, N.A._, 2021 U.S. Dist. LEXIS 259351, *29 (D.N.J. Sept. 17, 2021); _see also, Cruz v. JMC Holding, Ltd.,_ 2019 U.S. Dist. LEXIS 169071, *16-17 (D.N.J. 219) (approving settlement that represented 45% of plaintiffs' estimated maximum recovery); _Lenahan v. Sears, Roebuck & Co.,_ 2006 U.S. Dist. LEXIS 60307 (D.N.J. July 10, 2006), _aff'd._, 266 F. App'x 114 (3d Cir. 2008) (approving a $15 million settlement when maximum exposure at trial may have been as high as $104 million because of the uncertainty of the final disposition of a trial); _Mehling v. New York Life Ins. Co._, 248 F.R.D. 455, 462 (E.D. Pa. 2008) (finding a settlement amount reasonable that represented approximately 20% of the best possible recovery if all theories of recovery and damages were accepted by the Court); _In re Corel Corp. Inc. Sec. Litig._, 293 F. Supp. 2d 484, 490 (E.D. Pa. 2003) (concluding "[a] settlement amounting to 15% of maximum provable damages is within the range of settlement agreements approved by other courts in this District."); _Cullen v. Whitman Med. Corp._, 197 F.R.D. 136, 144 (E.D. Pa. 2000) (granting final approval where "[t]he settlement that was achieved represents approximately

---

[8] Note should also be made of the possibility of post-trial decertification, which has occurred in FLSA misclassification cases, most notably in _Johnson v. Big Lots Stores, Inc._, 561 F. Supp. 2d 567 (E.D. La. 2008), where a retail store manager collective was decertified _after_ trial.

Hon. Anne Marie Donio
November 7, 2024
Page 11 of 21

seventeen percent of single damages to the class, an amount significantly higher than the proportion of damages obtained in settlement agreements approved by other courts").

Although the focus of Factors 8 and 9 is to compare the settlement amount to the amounts potentially recoverable for the class or collective through continued litigation, this Court has requested that Plaintiffs address the relief that <u>each</u> individual plaintiff may have received if required to pursue their claims in arbitration. Order at 8 n. 3. The math set forth above represents precisely that, the net total of all their claims would have been $4.56 million or $7.95 million. Putting aside that such a comparison could be done in any class or collective settlement whatsoever whether or not an arbitration provision existed, here it would particularly and dramatically underscore the benefits of this collective settlement. This is because for many Opt-Ins, and potentially the majority, their recovery, were the arbitration route taken, would be zero, simply because of the difficulties with proceeding into arbitration whatsoever since, as noted at n.3 above, mass FLSA misclassification arbitrations are not likely or feasible (and relatively few are brought), and most individual Opt-Ins would not proceed with individual arbitrations if required to do so due to the time and individual effort involved if they could even find a lawyer willing to represent them to recover their individual damages. Lesser Supp. Dec. ¶ 13. Indeed, the ability to pool resources is the very foundation for allowing collective actions, as the Supreme Court recognized in the seminal decision that established the modern collective action structure, writing that they are favored because they allow for the "efficient resolution in one proceeding of common issues of law and fact," in addition to "lower[ing] individual costs to vindicate rights by the pooling of resources." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *see also Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (certifying collective actions achieves the FLSA's objectives of lowering costs and efficiently resolving common issues of law and fact in one proceeding). Further, even for those who were able to obtain an attorney and did pursue an arbitration, studies have shown that, on average, employees and consumers win less often and receive much lower damages in arbitration than they do in court. *See, e.g.,* "The Arbitration Epidemic" by the Economic Policy Institute.[9]

IV.    *The Hourly Rates of Plaintiffs' Counsel Are Reasonable Given Their Expertise and Experience in Complex Class and Collective Actions and Wage and Hour Litigation*

Previously, as relevant to the lodestar cross-check analysis, Plaintiffs had provided the Court with their time detail and a declaration attesting that the hourly rates Klafter Lesser charged in this case are the same rates that they charge paying clients, reflect their knowledge, experience and reputation, and that Klafter Lesser's hourly rates have been approved in this Court. Lesser Dec. (ECF #104-2) at ¶ 17. Plaintiffs now provide the Court with (1) a further declaration from Mr. Lesser (Ex. C hereto) addressing how Judges within this Court have handled previous fee applications by him and his firm for lodestar cross-check purposes, to which his original

---

[9] Available at https://www.epi.org/publication/the-arbitration-epidemic/ (last visited Oct. 31, 2024).

Hon. Anne Marie Donio
November 7, 2024
Page 12 of 21

application had only adverted, [10] (2) a declaration from Mr. Galpern (Ex. D hereto) concerning the reasonableness of the hourly rates charged by the Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C. (the "Javerbaum law firm"), and (3) six declarations from attorneys who all practice in this District, each of which supports the reasonableness of the hourly rates of Plaintiffs' counsel in this action, Shanon Carson, Esq. (Ex E hereto); Stephen DeNittis (Ex. F hereto); Andrew Milz, Esq. (Ex. G hereto); Lisa Rodriguez, Esq. (Ex. H hereto); Peter Winebrake (Ex. I hereto); and Andrew Wolf (Ex. J hereto). In addition, Plaintiffs also wish to make three supplementary brief points concerning the lodestar cross-check analysis required when awarding an attorney fee on a percentage of the benefit basis, which points may possibly assist the Court.

     *First*, the Third Circuit has made clear that in conducting a lodestar cross-check, a District Court can rely on summaries reflecting the hours and lodestars of firms and that it is not necessary to pains-takingly examine time records:

> we reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. *See [In re] Prudential [Insurance Co.]* 148 F.3d [283] at 342 [3rd Cir. 1998] (finding no abuse of discretion where district court "relied on time summaries, rather than detailed time records"). Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award. Lodestar multipliers are relevant to the abuse of discretion analysis. But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method.

*In re Rite-Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *see also Milliron v. T-Mobile United States*, 423 Fed. Appx. 131, 135-36 (3d Cir. 2011) (rejecting contention of an objector that the District Court should have excised certain time as part of its lodestar cross-check); *In re Humanigen, Inc. Sec. Litig.*, 2024 U.S. Dist. LEXIS 165094, *37-38 (D.N.J. Sept. 13, 2024) ("Courts in this District are encouraged to 'cross-check' the reasonableness of percentage fee awards against the lodestar method, though lodestar multipliers do not 'trump the primary reliance on the percentage of common fund method.'" (citing *Rite-Aid, supra*); *Bredbenner v. Liberty Travel, Inc.*, 2011 U.S. Dist. LEXIS 38663, *61 (D.N.J. April 8, 2011) ("In determining the lodestar for cross-check purposes, the Court need not engage in a "full-blown lodestar inquiry," or "mathematical precision; absent objections, "a full-blown lodestar analysis is an unnecessary and inefficient use of judicial resources.") (citations omitted).

     *Second*, the Third Circuit has further explained that the lodestar cross-check analysis is a multi-faceted one requiring multiplying "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the

---

[10] The Lesser Supplemental Declaration also attests to a fact, which was not explicitly stated in the original Lesser Declaration, that Klafter Lesser's hourly clients in New Jersey pay Klafter Lesser's usual hourly rates. Lesser Supp. Dec. ¶ 15 fn 1.

Hon. Anne Marie Donio
November 7, 2024
Page 13 of 21

nature of the services provided, and the experience of the attorneys" and then applying a multiplier "that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Rite-Aid*, 396 F.3d at 305-306. The Court of Appeals has also counseled that in conducting this analysis, "the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Id.* at 306; *Milliron v. T-Mobile United States*, 423 Fed. Appx. 131, 136 (3d Cir. 2011) (same).

Accordingly, the attorney hourly rates of the Javerbaum law firm (which has offices in Cherry Hill and Vorhees) range from $450 to $950 (Galpern Dec. ¶ 3) and are comparable to the hourly rates of Klafter Lesser, which range from $400 to $1150 (Lesser Dec. (ECF # 104-2) ¶ 17) and which, on a blended bases are $824 as compared to a rate of $775 for Klafter Lesser. The six declarations from other lawyers and firms also having the expertise and experience to engage in complex cases akin to that here confirm that these hourly rates are in line are charged by other plaintiff-side firms of like experience who practice in this District and in this Court and which rates have been approved by this District and Court's judges, as well as by New Jersey State court judges (in the case of Mr. Wolf).

Specifically, the hourly rates charged by another highly experienced plaintiffs' firm, the Philadelphia-based Berger & Montague firm, which also prosecutes FLSA wage and hour cases in this Court, has usual attorney hourly rates ranging from $595 to $1,180, and has its usual rates used in conjunction with lodestar cross-check analyses by this Court, among many others. *See* Carson Dec. ¶¶ 14-15; *see also* ¶ 18 ("Based on my knowledge, our hourly rates are the prevailing market rates for firms that handle complex class and collective actions in this District, including in this Courthouse"). Similarly, the hourly rates charged for class action and wage and hour lawyers at the New Jersey law firm of DeNittis Osefchen Prince, P.C., which firm also prosecutes substantial collective FLSA, and class state, wage and hour cases, range from $500 to $975. *See* DeNittis Dec. ¶¶ 11, 13 (the rates of Plaintiffs' firms here "are reasonable and consistent with the current market rate for attorneys who represent plaintiffs in similar substantial class and similar cases within this Court, including cases on behalf of employees of national chain defendants."). And the rates charged by Peter Winebrake of Winebrake & Santillo, with 33 years of experience, a firm which also prosecutes FLSA and wage and hour cases in this Court, is $820, although he can "attest to the fact that seasoned partners at some firms regularly utilize rates exceeding $1,000/hour when submitting fees to federal courts and for purposes of allocating fees amongst the team of lawyers representing the class, including cases within my geographic area [Pennsylvania and New Jersey]" and that, as to Mr. Lesser, "I unquestionably would expect his hourly rate to exceed $1,000 for work on class/collective litigation. Put differently, if I were negotiating a fee-sharing agreement with Mr. Lesser's firm, I would expect that, pursuant to the agreement, Mr. Lesser would be credited with over $1,000 for every hour he dedicated to the file. I also would expect Mr. Lesser to play the role of "lead counsel" due to his vast experience in the field and due to status within the plaintiffs' wage and hour bar.").

Likewise, the rates charged by the Flitter Milz firm, the Dann Law firm and Dilworth Paxson LLP, are also not materially different from the rates by Plaintiffs' counsel here and attorneys from all those firms attest to how Plaintiffs' counsel's rates are both reasonable and customary within this Court for the kind of work undertaken. *See* Declaration of Andrew Milz at

Hon. Anne Marie Donio
November 7, 2024
Page 14 of 21

¶ 12 (attesting to hourly rates for a senior lawyer of up to $905), ¶ 15 ("The rates sought by the experienced lawyers here are reasonable and, in the context of a contingent common fund cases such as this, within the usual market rate for such cases in the District of New Jersey for work on a complex class action-type lawsuits."); Declaration of Lisa Rodriguez, whose hourly rate is $1,145 at ¶ 4 (testifying that the hourly rates by counsel here "are reasonable and customary for this type of litigation pending in the District of New Jersey, including in Southern New Jersey, for work on a complex lawsuit / class action-type lawsuits including on behalf of workers, [and] [b]ased upon my understanding of the experience and reputation of the Klafter Lesser and Javerbaum law firms, hourly rates of $400 to $1150 for their time in the above-captioned matter are reasonable and consistent within the range of the current market rate for attorneys who represent plaintiffs in similar substantial class and similar cases within this Court."); Andrew Wolf, Wolf Dec. ¶¶ 17-18 (attesting to how the rates being sought here "are reasonable for the market rate for such Attorneys [in New Jersey]").

The Lesser Supplemental Declaration further attests to the manner in which the Klafter Lesser firm's rates have been the basis for multiple fee award requests in the District of New Jersey and/or this Court itself as part of lodestar analyses which were presented the Court, all of which fee applications have been granted. *See* Lesser Supp. Dec. ¶ 15. For instance, in *Hegab v. Family Dollar Stores, Inc.*, 2015 U.S. Dist. LEXIS 28570, *37-38 (D.N.J. Mar. 9, 2015), *a full nine years ago* Klafter Lesser's usual and customary hourly rates then in effect for lawyers of $700 to $800 and $295 for an experienced paralegal were thus found, for lodestar cross-check purposes "to be appropriate" in a managerial misclassification settlement of $1.15 million. *Id.*

Additionally, all of the declarants' law firms have extensive track records of pursuing large class or collective actions under the FLSA and other complex class or collective litigation, which is significant because litigating and obtaining multi-million dollar FLSA collective and analogue state wage hour cases – such as the prior *Goodman* case against Burlington as well this case – require such experience as they are treated by defendants, like Burlington, as exceedingly complex class action matters for which they hire top nationwide law firms to defend, as Burlington did in *Goodman* with the Putney Twombly firm from New York and the Orrick law firm from San Francisco and have done here with the prominent Morgan Lewis law firm. The reputation and quality of work necessary to achieve multi-million-dollar FLSA settlements can be fairly said to be no less than that in nearly any other high-monetary stakes area of class action law. Lesser Supp. Dec. ¶ 16 (attesting to this); Carson Dec. ¶ 16 (attesting to how "to prosecute wage and hour class and collective action litigation at the highest level and obtain results such as the results that have been obtained in this case" there is needed "deep expertise" in multiple specific areas of which he lists), *id.* at ¶ 12 (attesting to "nationwide reputation for large and complex FLSA cases" as to Klafter Lesser), *id.* at ¶ 13 (attesting to the Javerbaum's firm's "capabilities, excellent work product, and adherence to legal ethics and professional responsibility"); DeNittis Dec. ¶ 10 (attesting to, as to Mr. Galpern and the Javerbaum firm, how they are "known for their contingent fee representation of their clients, and obtain excellent results for their clients, through work of the highest caliber and with the highest ethical standards," and "while I have not worked with Mr. Lesser or the Klafter Lesser law firm, I am well aware of his and the firm's high reputation as a national matter in the FLSA/wage and hour context."); Milz Dec. ¶ 13 (similarly attesting to Mr. Lesser being "a nationally renowned consumer and employment class action lawyer"); *id.* at ¶ 14

Hon. Anne Marie Donio
November 7, 2024
Page 15 of 21

("Based on my familiarity with the market for legal services in connection with widespread consumer or employment problems sometimes involving relatively small individual damages, where the claims are brought on a class or collective basis against major national companies, it is my belief that the hourly rates charged by Plaintiffs' counsel are reasonable and appropriate New Jersey market rates in this matter."); Winebrake Dec. ¶ 8 (statement as to national reputation in different words); Wolf Dec. ¶ 16 (same as to consumer law; "[h]is Hourly rate is reasonable for an attorney with his vast experience."); *see also* Rodriguez Dec. ¶ 8 (quoted above).

As a result, given the parameters of what the Court should look at, and in light of these multiple declarations from other practitioners, Plaintiffs would also submit that in considering the reasonableness of the hourly rates of Plaintiffs' counsel, this Court should consider the range of reasonable hourly rates approved by courts within this District recently in other types of complex class action cases. *See In re Humanigen, Inc. Sec. Litig.*, 2024 U.S. Dist. LEXIS 165094, *37-38 (D.N.J. Sept. 13, 2024) (securities case in which the Court found billing rates of $900- 1,325 per hour for partners, $500-600 per hour for associates, and $325 per hour for non-attorney analysts and paralegals to be reasonable for lodestar cross-check analysis); *Holden v. Guardian Analytics, Inc.*, 2024 U.S. Dist. LEXIS 100349, *36-37 (D.N.J. June 5, 2024 (data breach/privacy case in which the Court found hourly billing rates ranging from $450 for associates to $1,125 for partners to be reasonable hourly billing rates for the services provided based on the given geographical area, the nature of the services provided, and the experience of the attorneys). Klafter Lesser handles these types of cases as well as substantial wage and hour cases. *See* ECF #104-5 (Klafter Lesser firm resume); Lesser Supp. Dec. ¶¶ 15-16.

In this Court's discussion of the percentage of recovery method for awarding an attorney fee, it referred to *Loughner v. Univ of Pittsburgh*, 260 F.3d 173 (3d Cir. 2001), and *Rastelli Partners, LLC v. Baker*, No. 23-2967, 2024 WL 960485, at *9 (D.N.J. Mar. 6, 2024). (Order at 9-10), which are both decisions concerning fee awards pursuant to prevailing party jurisprudence. *See Loughner*, 260 F.3d at 173 ("This appeal raises a troublesome and recurring problem pertaining to the award of attorneys' fees and costs to a prevailing party under a federal statute and the duty of a district court in dealing with the prevailing party's petition for fees."); *Rastelli Partners, LLC*, 2024 U.S. Dist. LEXIS 38965 *; 2024 WL 960485 (D.N.J. March 6, 2024) (attorney fees sought pursuant to the prevailing party provision in an agreement that the Plaintiff accused the Defendant of violating.). Of first note, it is recognized that prevailing party/statutory fee analyses involve entirely different considerations than those applicable, as here, to common fund fee requests. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir. 2001) (discussing material differences between statutory and common fund fee awards); *McLendon v. Continental Group*, 872 F. Supp. 142, 156 (D.N.J. 1994) (holding that "numerous differences between statutory fee and common fund cases render much of the reasoning in the statutory fees cases inapplicable to the common fund context); *In re GNC Shareholder Litig*, 668 F. Supp. 450, 451-52 (W.D. Pa. 1987) ("The Supreme Court has noted a distinction in determinations of reasonable fees between common fund cases and cases involving statutory fee-shifting to the prevailing parties, such as cases under the Civil Rights Act, 42 U.S.C. § 1988, and under the Clean Air Act, 42 U.S.C. § 7604(d). In the former cases, a reasonable fee will be based largely on a fair percentage of the common fund because the fund itself is the measure of success. Newberg, supra, at § 14.03.

Hon. Anne Marie Donio
November 7, 2024
Page 16 of 21

In the latter cases, a reasonable fee should be synonymous with traditional compensation paid by the client – 'for all time reasonably expended on a matter.'") (Citations omitted).

Not only was *Rastelli* a fee shifting case where the Court applied a prevailing party analysis, as a litigation matter, but it was not comparable to this case or to the recovery obtained here inasmuch as *Rastelli* was not a class or otherwise complex litigation. Rather, while the Court noted that the representation had been excellent, it wrote that "the legal issue at the core of this case—breach of contract—was not unusually complex" and began its prevailing party analysis by recognizing the point that "fee applicant carries the initial burden of producing sufficient evidence of *what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered*." *Rastelli*, 2024 U.S. Dist. LEXIS 38965 at *12 (emphasis supplied; citing cases). The essential character of the representation in that case was that the plaintiff's lawyers had been paid by their client pursuant to their retainer agreements, and it was the hourly rates they actually charged their own clients that the court addressed. While hourly rates that are not contingent and paid on an ongoing basis by a client are relevant to a prevailing party fee award, the hourly rates relevant to a lodestar cross-check are multi-faceted and must include the nature of the services provided, the nature of the claims, and the general skills and experience needed to pursue the case – *i.e.*, "the essential character and complexity of the legal services rendered" – which here include the skill and experience to often pursue years of litigation in order to obtain multimillion dollar settlements from major corporate defendants in FLSA and other complex class action litigation, as set forth above. *See also, e.g. Stillman v. Staples, supra* (years of litigation leading to a successful jury verdict in one of the first FLSA misclassification collectives ever taken to verdict and to resolve the entire litigation (Memorandum in Support of Motion for Approval (ECF #104-1) at 4 n.5)); *Goodman/Kawa, supra* (nine plus years of litigation where the next step was a trial after Plaintiffs had obtained final certification of a large FLSA collective).

Additionally, this case followed-upon the *Goodman/Kawa* cases and that experience permitted not just the filing of this action but the moving of this case forward with a quick motion for conditional certification. It was Plaintiffs' counsel's dogged pursuit of the claims in the *Goodman/Kawa* cases that quickly led Burlington to attempt to resolve this case. That prior experience, which directly benefitted the Opt-Ins here, further supports the reasonableness of counsel's hourly rates. Thus, in *Starnes v. Amazon.Com, Inc.*, 2023 U.S. Dist. LEXIS 79515, *26 (E.D. Pa. May 8, 2023), the court directly addressed this point in doing lodestar cross-check in a FLSA case which was settled on a pre-suit basis because of how counsel had "obtained positive results in multiple Fair Labor Standards Act class and collective actions on behalf of other Delivery Associates against Amazon which directly benefited the class in this case."  It pointed to a number of other authorities to the same effect, including an approval of a *5.29* multiplier in another FLSA settlement which followed upon earlier cases because "'[i]t would be inequitable for a court to reduce a fee award based on a lodestar cross-check without considering a law firm's work other cases raising the same or similar issues' because '[t]hat work may . . . substantially enhance the result Class Counsel is able to achieve.'"  *Id*. at *24 (*quoting Arp v. Hohla & Wyss Enterprises*, LLC, No. 18-119, 2020 U.S. Dist. LEXIS 207512 at *7 (S.D. Ohio Nov. 5, 2020)). This was

true for several reasons, including that (1) successfully litigating a particular issue may improve the settlement prospects of cases raising the same issue, (2)

Hon. Anne Marie Donio
November 7, 2024
Page 17 of 21

> developing expertise in a specific niche improves the firm's ability to effectively
> litigate within that niche, and (3) the work product from one case can be used in a
> case raising the same issue, resulting in value that is not adequately reflected in a
> lodestar calculation.

*Id*. The same is no less true here. Burlington agreed to try to settle this case early unquestionably because of the Plaintiffs' counsel's prosecution of prior *Goodman* and *Kawa* cases and Plaintiffs' counsel should not be penalized for having undertaken to try to settle expeditiously because, most certainly, while choosing instead to litigate further once Burlington had made it clear it wished to try to settle would have resulted in a much higher lodestar (and, hence, lower multiplier), agreeing to the negotiation without delay was in the best interests of the clients in obtaining recovery sooner and avoiding litigation risk.[11]

    Irrespective of all these considerations, however, what is finally important is that the Third Circuit has further counseled that although the resulting multiplier need not fall within any pre-defined range, that "consideration of multipliers used in comparable cases may be appropriate." *Rite-Aid*, 396 F.3d at 307 n.17. Here. the multiplier in this case of 2.17 is squarely within the range of multipliers (1 to 4) typically approved by courts within the Third Circuit in FLSA settlements in comparable FLSA collective cases. *See* ECF 104-1 at 38; ECF 104-2 at 13 (also noting how lodestar would be 2.88 even if the time spent on seeking approval of the prior settlement was excised).[12]

---

[11] Even if the multiplier was substantially higher it would still be reasonable in circumstances, as here, where counsel was able to obtain a settlement expeditiously without years of litigation because "counsel should not be penalized for settling the case early in the litigation." *Arrington v. Optimum Healthcare IT, LLC*, No. 17-3950, 2018 U.S. Dist. LEXIS 186192, *30 (E.D. Pa. Oct. 31, 2018) (awarding 5.3 multiplier); *see also, e.g., In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) (concluding that, under the cross-check approach, a lodestar multiplier in the range of 4.5 to 8.5 was "unquestionably reasonable"). As another court wrote in approving a 1/3rd fee in a $4.9 million wage and hour settlement which settled soon after filing:

> Here, the lodestar [multiplier] sought by Class Counsel, approximately 6.3 times, falls within the range granted by courts and equals the one-third percentage being sought. While this multiplier is near the higher end of the range of multipliers that courts have allowed, this should not result in penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial.

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) (citing numerous other cases); *accord Yuzary v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693 (PGG), 2013 U.S. Dist. LEXIS 144327, at *29 (S.D.N.Y. Oct. 2, 2013) (same language made in approving 7.6 multiplier in wage and hour case). Accordingly, under these precedents, even a 5-6 multiplier for this Settlement would be approvable.

[12] Even further, these lodestar calculations do not include the expected time to be spent hereafter in administering the settlement and addressing inquiries from the Opt-Ins, which we estimate to

Hon. Anne Marie Donio
November 7, 2024
Page 18 of 21

V.    *The Remote Possibility of Any Uncashed Checks Should Have No Effect Upon the
Amount or Timing of this Court's Attorney Fee Award As There is No Longer a
Reverter So There Will Not Be Any Remaining Funds Left – All Monies Will Be Paid
Out to Opt-Ins.*

By the Rider to the Settlement Agreement, there is no longer any reverter to Burlington
from uncashed checks, which was the only reverter in the Settlement Agreement. Instead, now,
the funds resulting from any uncashed or undeposited funds (which are most likely to be *de minimis*
in the extreme, *see* Lesser Dec. (ECF No. 104-2) at ¶ 16 and Cervarich Dec. (ECF No. 104-7) at ¶
5)) will be redistributed to those Opt-ins who did cash or deposit their checks on a pro-rata basis,
provided they will receive at least $20. Obviously, where, as revised here, all funds will be paid
to and benefit Opt-ins, the concern raised in *In re Wawa Inc., Data Sec. Litig.*, 85 F.4th 712 (3rd Cir.
2023) becomes irrelevant.[13]

VI.    *The Clear Sailing Provision Does Not Provide Any Basis for Any Suggestion of
Collusion*

The Settlement Agreement between Plaintiffs and Burlington contains a provision
providing that "Burlington will not oppose a Cost and Fee Award of no more than one third (1/3rd)
of the Maximum Settlement Amount for attorney's fees plus reimbursement of Plaintiffs'
Counsel's expenses." The circumstances that led to this provision dispel any suggestion that it was
the product of collusion at the expense of the collective.

As the Third Circuit held in *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 447
(3d Cir. 2016), and reaffirmed in *In re Wawa, Inc. Data Sec. Litig.*, 85 4th 712, 725 n.24 (3d Cir.
2023, the presence of a "clear sailing provision" is not a *per se* bar to settlement approval. And

---

be 150 hours, which would lower the multiplier. *See* Lesser Dec. (ECF #104-2) at ¶ 18. Nor do
they include the time involved in preparing this letter or responding over the last few months to
client inquiries.

[13] Additionally, the *Wawa* decision was focused on the issue of an unknown claims rate, but here,
the claims rate is already known inasmuch as every Opt-In – treated as though they were individual
clients – was asked whether they would wish to opt-out from the Settlement, and not a single one
said they would. *See* ECF #105 & #106. Obviously, any such Opt-In client could change his or her
mind because, as a belts-and-suspenders matter, the Settlement process here also provides them
with a final opportunity to opt-out, but the proposed Final Judgement already provides for a fee
reduction in such event, as this Court has already noted, and this will be known before any
attorneys' fees awarded by the Court can be paid to Plaintiffs' Counsel. Order at 12; ECF # 104-3
at 11 (attorneys' fees are to be paid 10 days after expiration of the opt-out period). Whether a check
will be deposited or cashed has nothing to do with how many *claims* there will be and what
payments will be made to the Opt-Ins, the stated *Wawa* concern. Indeed, Plaintiffs' counsel should
not be penalized if a client Opt-In does not cash or deposit their check after reasonable attempts
are made for the Opt-In to do so, particularly where, as here, any such resulting funds will be
redistributed to other Opt-Ins. There will be no inappropriate windfall to the lawyers whatsoever.

Hon. Anne Marie Donio
November 7, 2024
Page 19 of 21

while the Third Circuit has directed district courts to give extra scrutiny to such agreements, the focus of such scrutiny is to assess whether there was any compromise of the interests of the class in favor class counsel's attorney fee. *NFL Players*, 821 F.3d at 447; *Wawa*, 85 F.4th at 725. To assess the possibility of collusion, the Third Circuit has directed District Court's to "review the process and substance of the settlement and satisfy itself that the agreement does not indicate collusion or otherwise pose a problem." *Wawa*, 85 F.4th at 726.

Here, as to the attorneys' fees and the "clear sailing provision," during the mediation of the original proposed settlement before an experienced and respected mediator, there was no discussion of the subject of attorneys' fees at all during that negotiation, except that it was agreed-upon at the outset that the settlement would be a common fund one from which the recovery for the settlement collective would come, as well as attorneys' fees and expenses, service awards, and the cost of an administrator. Burlington wanted to negotiate, as did Plaintiffs, an all-in number and all the negotiation took place through the mediator. Galpern Dec. ¶¶ 5-7, 11-12, Lesser Supp. Dec. ¶ 6. While the use of a mediator is not dispositive of the issue, this fact weighs in favor of a finding of non-collusiveness. *Wawa*, 85 F. 4th at 726. So does the fact there was no negotiation of the subject of attorneys' fees at all before the collective's recovery was agreed to. *Id.* Plaintiffs' counsel here were, thus in fact, fully aligned with the interests of the collective throughout those negotiations because, as was obvious and an integral part of the entire negotiation, the larger the consideration they could obtain for the collective, the larger could be their attorney fee, which they, the mediator, and Defendant's counsel knew they would be seeking on a percentage of the benefit basis. There was no discussion thereafter, much less any negotiation of the attorney fee provision, and at the conclusion of the mediation, the total settlement amount of $11 million was reached. And, as to the clear sailing agreement, one was included because one had been contained in the prior Goodman settlement and it carried over into the Settlement here. Galpern Dec. ¶¶ 11-12; Lesser Supp. Dec. ¶ 6.

That was during the original negotiation. Following the Court's rejection of the original proposed Settlement and the opt-ins joined the case, the Parties, as noted above, negotiated and agreed to carry over the proportional amount per person for all the opt-ins who had joined. At the time of this post-opt-in negotiation, again, no negotiation was had whatsoever as to the attorneys' fee provisions or the clear sailing provision, both of which were carried over from the original proposed settlement. Galpern Dec. ¶ 11; Lesser Supp. Decl. ¶ 7.

In short, there was thus absolutely no collusion or improper bargaining involved. Galpern Dec. ¶¶ 5, 8; Lesser Supp. Dec. ¶8. While the *Wawa* Court did not give credence to the contention the fees in that case were not negotiated until after the consideration for the class had been agreed to, the Court's view was driven by the strongly implied fact in that case – that all parties knew there would be a subsequent fee negotiation when the consideration for a class was being negotiated. That was because in *Wawa*, after negotiating a $9 million gift-card class settlement, counsel for the parties in that case turned to negotiating the fee of the plaintiffs' counsel, which negotiations led to agreement on a $3.2 million fee and a clear sailing agreement regarding that negotiated fee, plus an added oddity that any unawarded counsel fees were to be returned to the defendant.. 85 F.4th at 718-19, 726-27. Those problems are simply not present here – at no time, before or after the negotiation of the primary settlement terms for the collective's recovery, were

Hon. Anne Marie Donio
November 7, 2024
Page 20 of 21

fees or even the clear sailing provision negotiated and there is no unawarded fee reverting to Burlington.

Where, as was the case here, the negotiating process provides no evidence that a plaintiffs' counsel put their interests ahead of those of the class they were representing, the Third Circuit has affirmed a district court's conclusion that the "clear sailing" provision was unobjectionable. *See NFL Players* 821 F.3d 447 ("[t] here is simply no evidence in the negotiation process or the final terms of the settlement that class counsel bargained away the claims of retired players in return for their own fees."); *see also Sorace v. Wells Fargo Bank, N.A.*, No. 20-4318, 2024 U.S. Dist. LEXIS 26340, *31 (E.D. Pa. Feb. 15, 2024) (relying on declaration concerning the settlement negotiations and also finding that the proposed Settlement Agreement's benefits to class members were "indicative of zealous advocacy on behalf of class members and an arms'-length deal absent collusion.").

Here, the circumstances of the settlement negotiations and the absence of fee negotiations, as evidenced by the declaration of Plaintiffs' counsel, the significant monetary benefits obtained for the collective and the role of a highly experienced mediator in obtaining those monetary benefits all evidence a complete lack of collusion. This Court should find the "clear sailing" provision here to be unobjectionable.

VII.    *The Service Awards and Mutual Releases Should Be Approved*

Lastly, at ECF #190 at 12-15, the Court requested support for the general releases the three Named Plaintiffs would give, under the terms of the Settlement, if this Court approves the requests for their Service Awards. As noted above, the Parties have agreed to eliminate conditioning the Service Awards on providing a General Release. *See* Rider at ¶¶ 3-6. Given this change, the issue raised by the Court has no applicability here and for the reasons previously set forth, the Court should approve the requested Service Awards for the Named Plaintiffs in return for their service to this case. *See* ECF #104-1 at 39-42.

While the Named Plaintiffs are still required to provide a General Release under the amended Settlement Agreement, that Agreement now requires that Burlington also provide, in turn, a general release to the Named Plaintiffs. *See* Rider at ¶ 6. Burlington's mutual general release therefore provides the consideration for the Named Plaintiffs' general release. Where mutual general releases are agreed to, they have received court approval. For instance, in *Mikityuk v. Cision US Inc.,* 2022 U.S. Dist. LEXIS 135405 (S.D.N.Y. July 29, 2022), the court approved a collective settlement with service awards and which also provided for a mutual release where, as here (Lesser Supp. Dec. ¶ 17) the named Plaintiffs no longer worked for the defendant:

While the releases for the Named Plaintiffs are broader, they are also mutual. *See* Dkt. No. 200-1. "[S]ome courts in this District have approved a general release when (1) it is mutual; and (2) the employer and employee have ceased their employment relationship." *Strauss v. Little Fish Corp.,* 2020 U.S. Dist. LEXIS July 17, 2020). This Court is one such court; in approving a general *mutual release* in *Strauss*, the Court explained that "[s]uch a broad *mutual* general *release* operates

Hon. Anne Marie Donio
November 7, 2024
Page 21 of 21

> as a walk away provision: it permits each side to terminate their relationship entirely
> free from fear that the other will re-engage in the form of a lawsuit." *Id.* None of
> the Named Plaintiffs—those subject to the general *mutual release*—still work for
> Defendants. *See* Dkt. No. 88 (referring to the end dates of the employment of the
> Named Plaintiffs—Mikityuk, Honey, and Tallangun); Dkt. No. 192 at 21 ("Named
> Plaintiffs, Opt-in Deponent, and Opt-in Declarants were no longer employed by
> Cision when they brought the case . . ."). A general *mutual release* will "ensure that
> both the employees and the employer are walking away from their relationship up
> to that point in time without the potential for any further disputes." *Souza v. 65 St.*
> *Marks Bistro,* 2015 U.S. Dist. LEXIS 2015 WL 7271747, at 5 (S.D.N.Y. Nov. 6,
> 2015).

*Id.* at *17-18; *Abrew v. Torti Food, Corp.*, 2024 U.S. Dist. LEXIS 1833, *5 (S.D.N.Y. Jan. 4, 2024)
(finding mutual general release clause in FLSA settlement to be fair and reasonable). Further, in
one of the decisions cited by this Court at Order at 14 – *Marin v. Apple-Metro, Inc.,* No. 12-5274,
2024 WL 4363629 (E.D.N.Y. Mar. 29, 2024) – the court expressly limited its holding to a "non-
mutual general release provision," with the implication that a mutual release would not be
objectionable:

> While the Court has no issue with compensating the named plaintiffs for their
> efforts, the parties are advised that, should they renew their motion at a later date,
> the Court will not approve of <u>any non-mutual general release provision</u>, even if
> included in exchange for incentive awards.

*Id*. at &13 (emphasis added). None of the other decisions this Court cited at pages 14-15 of its
Order addressed or were faced with a mutual general release. The mutual release provisions now
a part of the Settlement Agreement should therefore be approved as well as the entire Settlement
and the Service Awards themselves.

## CONCLUSION

We hope that we have satisfactorily addressed the issues the Court raised in the October
28 Order. Nonetheless, should the Court have any further or additional concerns, we would most
certainly appreciate the opportunity to address them with the Court at its earliest convenience. If
the Court has no further concerns it would like the Parties to address, for all of the foregoing
reasons, and in light of the revisions to the Settlement Agreement set forth in the Rider, we most
respectfully submit that Plaintiffs' Motion (ECF #104) should be granted in all respects.

Respectfully submitted,

Seth R. Lesser

Cc:    All Counsel of Record via ECF