[D.I. 104]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| KIM PAYTON-FERNANDEZ, LAVERN COLEMAN, and DARNIEL WILLIAMS, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURLINGTON STORES, INC., et al.,<br><br>Defendants. | Civil No. 22-608 (AMD)<br><br><br><br>**MEMORANDUM OPINION** |

**APPEARANCES**:

Michael A. Galpern, Esq.
Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins
Laurel Oak Corporate Center
1000 Haddonfield-Berlin Road
Suite 203
Voorhees, NJ 08043

Seth Richard Lesser, Esq.
Klafter Lesser LLP
Two International Drive
Suite 350
Rye Brook, NY 10573

        *Counsel for Plaintiffs*

August W. Heckman, III, Esq.
Rudolph J. Burshnic, Esq.
Morgan, Lewis & Bockius LLP
502 Carnegie Center
Princeton, NJ 08540-6241

        *Counsel for Defendants*

**DONIO**, **Magistrate Judge:**

This matter comes before the Court by way of unopposed motion [D.I. 104] of Plaintiffs, Kim Payton-Fernandez, Lavern Coleman, and Darniel Williams, individually and on behalf of others similarly situated, for approval of a settlement agreement under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*. The Court has considered the submissions and decides this matter pursuant to Federal Rule of Civil Procedure 78(b).[1] For the reasons that follow and for good cause shown, the motion is granted.

The background of this case is set forth at length in this Court's Opinion and Order dated April 28, 2023 and is incorporated herein by reference. *See Payton-Fernandez v. Burlington Stores, Inc.*, 671 F. Supp. 3d 512, 518 (D.N.J. 2023). Generally, Plaintiffs allege in this action that Defendants, Burlington Stores, Inc., Burlington Coat Factory Warehouse Corporation, Burlington Coat Factory Investment Holdings, Inc., and Burlington Coat Factory Holdings, LLC (hereinafter,

---

[1] By Order dated October 28, 2024, the Court required Plaintiffs to file a supplemental submission addressing a number of issues. (Order [D.I. 109], Oct. 28, 2024, p. 16.) Plaintiffs filed a supplemental submission on November 7, 2024. (Letter from Seth R. Lesser, Esq. (hereinafter, "Pls.' Supp. Letter") [D.I. 111], Nov. 7, 2024.) In addition, Plaintiffs and Defendants provided further written submissions to address issues raised by the Court during a telephonic conference on December 6, 2024. (*See* Letter from Seth R. Lesser, Esq. [D.I. 115], Dec. 11, 2024; Letter from August W. Heckman, III, Esq. [D.I. 116], Dec. 13, 2024.) The Court has considered these supplemental submissions in deciding the instant motion.

"Defendants" or "Burlington"), violated federal and California wage and hour laws by misclassifying them as exempt under federal overtime laws and failing to pay them overtime wages. *Id.*

The parties previously participated in a full day of mediation and agreed to settle the case for a maximum settlement amount of $11 million, subject to court approval of the settlement. *Id.* at 519. The Court, however, denied Plaintiffs' motion for settlement approval without prejudice. *Id.* at 520, 534. In rejecting the proposed settlement, the Court first noted that Plaintiffs failed to address whether the putative opt-in plaintiffs are "similarly situated" as required by 29 U.S.C. § 216(b). *Id.* at 522. The Court further found that even if the proposed collective satisfied the "similarly situated" requirement of § 216(b), there were "several procedural problems with the proposed protocol that preclude[d] the Court from approving the settlement." *Id.* at 523. The Court specifically concluded that because putative opt-in members had not yet opted into the case, Plaintiffs had "no authority to act as representatives of these potential collective members and settle the case on their behalf[.]" *Id.* at 530. Further, the Court rejected Plaintiffs' proposal that future opt-in plaintiffs may opt into this action by cashing a settlement check. *Id.* at 526. The Court also concluded that it was unable to assess the reasonableness of the attorneys' fees under Plaintiffs' proposed protocol because the Court could

not determine whether the attorneys' fees were reasonable until the number of putative collective members who would opt into this action was determined. *Id.* at 530.

Plaintiffs subsequently sought conditional certification of the collective. By Memorandum Opinion and Order dated October 30, 2023, the Court ordered that this action shall be "conditionally designated as a collective action under the FLSA consisting of 'All Assistant Store Managers ('ASMs') who worked in any of Burlington's stores in the United States at any time between February 4, 2019, and February 28, 2021, except for ASMs who participated in the *Goodman* settlement, for whom the period shall be August 20, 2020 to February 28, 2021[.]'" *Payton-Fernandez v. Burlington Stores, Inc.*, No. 22-608, 2023 WL 7131913, at *8 (D.N.J. Oct. 30, 2023).[2] On February 6, 2024, a settlement administrator sent a court-approved Notice and Consent to Join form to 1,715 putative collective members by U.S. mail and also sent the notice by e-mail and text to those potential collective members with valid email addresses and phone numbers included in the contact information provided by Defendants. (Decl. of Christopher Cervarich [D.I. 104-7], July 15, 2024, p. 1, ¶ 3.) In total, 828 Consent to Join forms were returned by the due date (*id.*), representing a 48% participation rate. The Consent to Join forms

---

[2] "*Goodman*" refers to *Goodman v. Burlington Coat Factory Warehouse Corp.*, Civil No. 11-4395 (D.N.J.).

provided options for the opt-in plaintiffs to either be represented by Plaintiffs' current counsel, Klafter Lesser LLP (hereinafter, "Klafter Lesser") and Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins (hereinafter, "Javerbaum"), designate their own counsel, or proceed *pro se*. (*See* Consent to Join Collective Action Under the Fair Labor Standards Act [D.I. 58-2].) The Consent to Join forms further provided that if the opt-in plaintiffs chose to proceed through Plaintiffs' counsel, the opt-in plaintiffs "agree[d] to [counsel] making decisions on [the opt-in plaintiffs'] behalf concerning the litigation, including the method and manner of conducting the case; the negotiation, terms, and approval of any settlement; and all other matters pertaining to the case, except that [the opt-in plaintiffs would] have the option not to accept any settlement proposed by them and pursue [opt-in plaintiff's] own settlement and claim[.]" (*Id.*) Plaintiffs represent that all 828 opt-in plaintiffs designated Plaintiffs' counsel to represent them. (Decl. of Seth R. Lesser in Supp. of Pls.' Unopposed Mot. for Approval of Collective Action Settlement; for an Award of Attorneys' Fees and Expenses, Service Payments, Notice and Administration Costs; for Approval of PAGA Payment; and for Entry of a Final Approval Order and Judgment (hereinafter, "Lesser Decl.") [D.I. 104-2], July 16, 2024, p. 8, ¶ 13.)

Plaintiffs now seek approval of a settlement in the amount of $5.2 million on behalf of the 828 collective members who

opted into this action. Plaintiffs state in their supplemental submission that this amount was calculated based on the prior $11 million proposed settlement amount, as the parties utilized "the same value for working overtime hours negotiated previously and then applied it to the [828] Opt-Ins which led to a new total number of $5,130,565.21." (Pls.' Supp. Letter at p. 4.) Plaintiffs further state that they then "got Burlington to agree to round that amount up to $5.2 million, which actually improved the result for those who opted-in as compared to the original settlement." (*Id.*)

Plaintiffs propose that the settlement funds to each opt-in member will be calculated based on day-to-day time records. (Mem. of Law in Supp. of Pls.' Unopposed Mot. for Approval of Collective Action Settlement; for an Award of Attorneys' Fees and Expenses, Service Payments, Notice and Administration Costs; For Approval of PAGA Payment; and for Entry of a Final Approval Order and Judgment (hereinafter, "Pls.' Br.") [D.I. 104-1], p. 12 n.9.) Specifically, the proposed settlement agreement provides that settlement funds, after deduction of costs, fees and service awards, "will be paid pro rata to each Participating Collective Member" and the "pro-rata share of the Net Settlement Amount for each Participating Collective Member . . . will be determined by dividing the total number of overtime hours" of each member, as reflected in Burlington's time records, "by the total number of

overtime hours reflected in" Burlington's time records for all
participating members during the relevant time period. (Lesser
Decl., Ex. A [D.I. 104-3], p. 5, ¶ 3.) The parties propose that
half of a collective member's settlement award will be deemed
payment for unpaid overtime wages and the remaining half will be
deemed liquidated damages. (*Id.* at pp. 11-12, ¶ 12.) In addition,
the proposed settlement provides for $10,000 service awards to
each of the three named plaintiffs, a $15,000 allocation for the
California Private Attorneys General Act (hereinafter, "PAGA")
claim, payment of expenses in the amount of $116,534.10, and
attorneys' fees in the amount of $1,733,333, which represents 1/3
of the maximum settlement amount. (*Id.* at pp. 4, 8, 10, ¶¶ 6, 8-
9.) The proposed settlement agreement also contains a
confidentiality clause and release provisions. (*Id.* at pp. 8-10,
12, ¶¶ 7, 16.) By letter dated August 6, 2024, Plaintiffs' counsel
represented that counsel had "advised all 828 Opt-ins about the
proposed Settlement and invited them to raise any questions or
advise [counsel] of any intent to opt-out" and that "not a single
Opt-in has advised us of any intent to opt-out." (Letter from Seth
R. Lesser, Esq. [D.I. 105], Aug. 6, 2024.)

        Before addressing whether the settlement is fair and
reasonable, the Court first considers whether settlement approval
is required in this FLSA collective action. "Because the Third
Circuit has not provided any specific guidance on this issue,

district courts within this Circuit have looked to the Eleventh Circuit's opinion in *Lynn's Food [Stores, Inc. v. United States]* for guidance." *Kraus v. PA Fit II, LLC*, 155 F. Supp. 3d 516, 522-23 (E.D. Pa. 2016)(citing *Lynn's Food Stores Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)). Courts have concluded that under *Lynn's Food Stores*, parties must present a proposed settlement of FLSA claims to the district court for review and a determination of whether the settlement is fair and reasonable. *Joseph v. Caesar's Ent. Corp.*, No. 10-6293, 2012 WL 12898816, at *2 (D.N.J. July 23, 2012).

However, some courts in the Third Circuit have recently concluded that court approval of a settlement in an FLSA action is unnecessary. In *Alcantara v. Duran Landscaping, Inc.*, No. 21-03947, 2022 WL 2703610, at *1 (E.D. Pa. July 12, 2022), for example, the court concluded that the "rule requiring prior court approval of an FLSA settlement . . . has no support in the FLSA's text; it is a judge-made rule that makes litigation slower and more expensive and is at odds with the text of Rule 41." Although the court in *Alcantara* concluded that court approval was unnecessary in connection with an individual FLSA claim, the court expressly noted that "[a] collective action might be different in important respects and so might require court approval to protect opt-in plaintiffs who have not been as involved in the case." *Id.* at *3.

Subsequent to the *Alcantara* decision, another court within the Third Circuit addressed court approval of a settlement on behalf of an FLSA collective. In *Walker v. Marathon Petroleum Corp.*, 684 F. Supp. 3d 408, 413 (W.D. Pa. 2023), the court noted the *Alcantara* decision and considered "whether the analysis is any different where . . . the settlement agreement involves more than just the named plaintiff, and instead involves other opt-in plaintiffs." *Id.* The *Walker* court concluded that "there is no reason to treat an opt-in settlement agreement differently[.]" *Id.* In so finding, the *Walker* court considered the requirement for court approval of a settlement in a Rule 23 class action and noted that "Rule 23 creates an expanded, fiduciary role for courts in the class-action context to 'serve as a guardian of the rights of absent class members'" and protect "the due process rights of absentee interests[.]" *Id.* (internal quotation omitted). The court in *Walker* further noted, however, that "the principal-agent problems involving absent class members are not as much of a concern in an FLSA collective action" because "the collective's very existence 'depends upon the affirmative participation of opt-in plaintiffs.'" *Id.* at 413, 414 (quoting *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 224 (3d Cir. 2016)). The *Walker* court concluded that this "'fundamental, irreconcilable difference between § 216(b) and Rule 23' negates the need for rigid analysis and approval of a collective settlement akin to that for

a class action." *Id.* at 414 (quoting *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003)).

The decision in *Walker* is thus predicated on the presumption that the parties to an FLSA collective action settlement have already obtained the affirmative participation of opt-in plaintiffs prior to settlement negotiations. Indeed, the court in *Walker* expressly noted that "even if the § 216(b) plaintiff can demonstrate that there are other plaintiffs 'similarly situated' to him . . . he has no right to represent them" because "[u]nder § 216(b), the action does not become a 'collective' action unless other plaintiffs affirmatively opt into the class by giving written and filed consent." *Id.* (internal citations omitted). However, in this case the parties engaged in settlement discussions on behalf of individuals who did not yet file Consent to Join forms and did not have an opportunity to participate in settlement negotiations, a protocol that was not contemplated by the *Walker* court. This Court rejected the named Plaintiffs' attempt to settle this case prior to the opt-in process, finding that it contravenes the express requirements of the FLSA. The Court finds that judicial scrutiny of FLSA collective action settlements is appropriate to ensure that any settlement has the protections of the opt-in process. Thus, the Court finds that judicial approval is appropriate in FLSA collective action settlements.

The Court next considers certification of the FLSA collective before addressing the proposed settlement. *Payton-Fernandez*, 671 F. Supp. 3d at 522. "Section 216 provides that a collective action may only proceed 'by any one or more employees for and on behalf of himself or themselves *and other employees similarly situated*.'" *Id.* (quoting 29 U.S.C. § 216(b)). As the Court previously noted, in determining whether employees are "similarly situated" for purposes of the FLSA, courts in the Third Circuit utilize a two-stage process for certification, including "a preliminary determination as to whether the named plaintiffs have made a 'modest factual showing' that the employees identified in their complaint are 'similarly situated'" and a final determination, based on the preponderance of the evidence, that each plaintiff who has opted in to the collective action is similarly situated to the named plaintiff. *Id.* at 521 (internal citations omitted).

In this case, the parties have stipulated for settlement purposes only that the named plaintiffs and the opt-in plaintiffs are similarly situated. When they moved for conditional certification, Plaintiffs presented evidence "that all ASMs performed similar job duties, which included work that did not materially differ from the duties of non-exempt employees[,]" and the Court concluded that Plaintiffs "provided sufficient factual support for their contention that Defendants have a uniform

11

practice of classifying, managing, and compensating their ASMs." *Payton-Fernandez*, 2023 WL 7131913, at *5. In light of the Court's prior finding that the opt-in plaintiffs are similarly situated and the parties' stipulation to final certification, the Court will certify the collective for purposes of settlement approval.

The Court next considers whether to approve the FLSA settlement by conducting a three-part analysis:

> First, the court must determine that the settlement concerns a bona fide dispute. Second, the court must determine that the settlement is fair and reasonable to the Plaintiff-employee. And, third, the court must determine that the agreement does not frustrate the implementation of the FLSA in the workplace.

*Gabrielyan v. S.O. Rose Apartments LLC*, No. 15-1771, 2015 WL 5853924, at *2 (D.N.J. Oct. 5, 2015).

"As to the threshold question of whether the action concerns a bona fide dispute under the FLSA, the Court must inquire whether the settlement 'reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute' or whether it concerns some issue falling outside of an adversarial context between employer and employees, such as a 'mere waiver of statutory rights brought about [by] an employer's overreaching.'" *Fritz v. Terminite, Inc.*, No. 19-15749, 2020 WL 5015508, at *2 (D.N.J. Aug. 25, 2020)(quoting *Lynn's Food Stores*, 679 F.2d at 1354). "In essence, for a bona fide dispute to

exist, the dispute must fall within the contours of the FLSA and there must be evidence of the defendant's intent to reject or actual rejection of that claim when it is presented." *Kraus*, 155 F. Supp. 3d at 530.

In this case, Plaintiffs, who are present and former Assistant Store Managers at Defendants' retail stores within the United States, allege that they were misclassified as exempt from the overtime provisions of the FLSA given that their primary job duties purportedly did not materially differ from the duties of Defendants' non-exempt hourly paid employees. *Payton-Fernandez,* 2023 WL 7131913, at *1. Defendants deny that they violated the FLSA and dispute that Plaintiffs and the opt-in plaintiffs were exempt from the overtime provisions of the FLSA in light of their primary job duties as Assistant Store Managers. (*See* Lesser Decl., Ex. A [D.I. 104-3], pp. 2, 13, ¶¶ M, 19.) Because the parties dispute the exempt status of the ASM position, the Court concludes that the settlement agreement resolves a bona fide dispute.

The Court next determines whether the settlement agreement is fair and reasonable, which requires consideration of both the amount of compensation that Plaintiffs and the opt-in plaintiffs will receive and the amount of settlement proceeds allocated to counsel fees and expenses. When addressing the fairness of the settlement, "district courts in this Circuit have utilized the *Girsh* factors established for approving Rule 23 class

action settlements, which are: '(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) stage of the proceedings and the amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risks of maintaining the class action through the trial; (7) ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.'" *Brumley v. Camin Cargo Control, Inc.*, No. 08-1798, 2012 WL 1019337, at *4-5 (D.N.J. Mar. 26, 2012) (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). For the reasons set forth below, the Court finds that the *Girsh* factors, on balance, demonstrate that the proposed settlement is fair and reasonable.

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted). Plaintiffs assert that "the road ahead promised litigation that would be complex, expensive, and time-consuming[,]" particularly in light of counsel's experience in the related *Goodman* proceeding against Burlington that was litigated for more than nine years. (*See* Pls.' Supp. Letter at pp. 3, 5-6.) Plaintiffs' counsel represents that they "knew that the policies

and procedures applicable to the claims had not changed," had "obtained final pre-trial certification of the case" in *Goodman*, and now seek to "avoid re-litigation of scores of issues that had been previously addressed" in *Goodman*. (*Id.* at p. 3.) Plaintiffs do not address the extent to which collateral estoppel may have prevented re-litigation of previously-decided issues in light of the purported similarity between *Goodman* and the instant case, which might have minimized the time and expense of this litigation. Nonetheless, the Court recognizes that application of the collateral estoppel doctrine may have been disputed, and any issues that were not subject to collateral estoppel may have been subject to potentially extensive and expensive discovery as in *Goodman*. The settlement here occurred at an early stage of this litigation, prior to the commencement of discovery, and the parties have thereby avoided the expense and delay of the discovery that may have ensued if litigation of this matter continued. Consequently, the Court finds that the first *Girsh* factor supports approval of the settlement.

        The second *Girsh* factor is "the reaction of the class to the settlement[.]" *Girsh*, 521 F.2d at 157. "It is generally assumed that 'silence constitutes tacit consent to the agreement.'" *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 86 (D.N.J. 2001)(quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995)). Here, Plaintiffs'

15

counsel represents that they "advised all 828 Opt-ins about the proposed Settlement and invited them to raise any questions or advise [counsel] of any intent to opt out" but, as of October 16, 2024, "not a single Opt-in has advised [counsel] of any intent to opt-out." (Letter from Michael A. Galpern, Esq. [D.I. 106], Oct. 16, 2024.) The second *Girsh* factor therefore weighs in favor of approval of the settlement.

The third *Girsh* factor is "the stage of the proceedings and the amount of discovery completed[.]" *Girsh*, 521 F.2d at 157. This factor requires the Court to consider "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Corp.*, 55 F.3d at 813. Generally, "the inchoate stage of case development reduces [the court's] confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action." *Id.* at 814. Here, counsel participated in settlement negotiations early in the litigation, prior to certification of the collective or any discovery having been taken. However, as noted above, this case is similar to the *Goodman* litigation, "which addressed in great depth the same underlying claims and facts as this case[.]" (Pls.' Supp. Letter at p. 7.) Plaintiffs' counsel states that "there can be no question that Plaintiffs' counsel possessed a full appreciation of the merits of this case and of Defendants' defenses, including their arbitration defense, when

16

negotiating." (*Id.*) Moreover, in this case, Burlington provided the relevant time records prior to mediation, and the settlement amount was "driven by an analysis" of these records which "reflected the actual amount of ASM collective overtime during the relevant periods." (Supp. Decl. of Seth R. Lesser in Support of Pls.' Unopposed Mot. for an Award of Attorneys' Fees (hereinafter, "Supp. Lesser Decl.") [D.I. 111-3], Nov. 5, 2024, p. 2, ¶ 3.) Based on the information available to counsel through both the prior *Goodman* case and Burlington's time records for the plaintiffs here, the Court concludes that the parties had an adequate appreciation of the merits of the case before negotiating and thus concludes that the third *Girsh* factor weighs in favor of settlement approval.

The fourth *Girsh* factor requires the Court to consider "the risks of establishing liability[.]" *Girsh*, 521 F.2d at 157. Plaintiffs contend that they "might lose on the ultimate issue in this case – whether ASMs were misclassified - at trial and recover nothing or, even if successful at trial, recover less than the value of the settlement[.]" (Pls.' Supp. Letter at p. 7.) Plaintiffs also state that Defendants' dispute resolution program, which required arbitration and barred a collective action, may have required dismissal of this action. (*Id.* at p. 9.) The Court notes that Defendants filed a motion to stay these proceedings and compel arbitration, and although the motion was not decided due to the subsequent proposed settlement of the claims herein,

resolution of the arbitration issue may have increased the length and expense of litigation. *See, e.g.*, *Easterday v. USPack Logistics LLC*, No. 15-7559, 2021 WL 7629907, at *1-2 (D.N.J. June 30, 2021)(setting forth extensive years-long procedural history related to motion to compel arbitration), *aff'd*, 2022 WL 855583 (D.N.J. Mar. 23, 2022). The fourth *Girsh* factor thus weighs somewhat in favor of settlement.[3]

With respect to the risks of establishing damages, the fifth *Girsh* factor, Plaintiffs represent that they have time records which "reflected the actual amount of ASM collective overtime during the relevant periods." (Supp. Lesser Decl., p. 2, ¶ 3.) Plaintiffs note that it is unusual to have such time records, but they state that because such records exist in this case, they have the ability "to analyze the actual value of the claims[.]" (*Id.* at pp. 2-3, ¶ 3.) Notwithstanding the existence of records to support a damage award, however, Plaintiffs argue that there is "a disputed issue of law that is unsettled in this Circuit as to how

---

[3] Assuming that Defendants were successful in compelling arbitration, each Plaintiff and opt-in plaintiff would not be barred from seeking recovery altogether but rather would be required to pursue their claims through an alternate dispute resolution process. Plaintiffs contend that lawyers are unwilling to bring mid-manager misclassification cases on a "mass basis" but they do not assert that each plaintiff would be precluded from seeking relief on an individual basis in arbitration. (*See* Pls.' Supp. Letter at p. 4, n.3.) Nonetheless, the potential inability to proceed on a collective basis somewhat supports an early resolution of the case.

damages are calculated in misclassification cases: are they determined at a 'Fluctuating Work Week' ('FWW') or half time for work over 40 hours damage rate," or "are they determined at a 'regular' rate analysis which provides for half time up to expected hours to be worked and then time and a half beyond that[.]" (Pls.' Supp. Letter at p. 8.) One court in this District recently concluded that the FWW method may apply to FLSA misclassification cases but found that a jury may be required to determine whether the FWW method applies given the particular facts of the case. *Ivanovs v. Bayada Home Health Care, Inc.*, 674 F. Supp. 3d 115, 130-31 (D.N.J. 2023), *motion to certify appeal denied*, 2023 WL 5287815 (D.N.J. Aug. 17, 2023). Similarly, in *Depalma v. Scotts Co., LLC*, a case cited by Plaintiffs, the court held "that the Court may apply the FWW method to calculate damages in an exemption misclassification case" but "only if the parties had a 'mutual understanding that the fixed weekly salary was compensation for all hours worked each workweek and the salary provided compensation at a rate not less than the minimum wage for every hour worked.'" *Depalma v. Scotts Co., LLC,* No. 13-7740, 2019 WL 2417706, at *13 (D.N.J. June 10, 2019)(internal citation omitted). Thus, Plaintiffs may be able to establish damages at trial given the existence of time records, but the appropriate measure of calculating damages is an issue that may require resolution by a jury. The fifth *Girsh* factor is therefore neutral.

19

The likelihood of maintaining a collective action if the case was to proceed to trial, the sixth *Girsh* factor, is also neutral. *Girsh*, 521 F.2d at 157. As noted above, Defendants' dispute resolution program, which required arbitration and barred a collective action, may have precluded this case from proceeding as a collective action. Moreover, even if litigation continued on a collective basis, Defendants could have contested certification and moved to decertify the collective. However, the Court notes that "Plaintiffs defeated such a motion in *Goodman*" (Pls.' Supp. Letter at p. 9), and they have repeatedly noted the similarity between this case and the *Goodman* litigation. Plaintiffs also assert that they "believe that under New Jersey caselaw they had arguments to challenge" Defendants' arbitration arguments. (Pls.' Br. at p. 7.) The Court thus finds the sixth *Girsh* factor neither weighs in favor of nor against the settlement.

The seventh *Girsh* factor, Defendants' ability to withstand a greater judgment, does not weigh in favor of the settlement amount. *Girsh*, 521 F.2d at 157. Plaintiffs represent that "the risk of non-payment did not factor into plaintiffs' counsel's settlement analysis." (Pls.' Supp. Letter at p. 9.)

Finally, with respect to the eighth and ninth *Girsh* factors, the Court considers "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Ins. Co.*

Case 1:22-cv-00608-AMD     Document 117     Filed 12/23/24     Page 21 of 48 PageID: 2777


*Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 322 (3d Cir. 1998). Plaintiffs' recovery pursuant to the settlement represents 57% of their potential maximum recovery, including liquidated damages, if the FWW method applies and a 32.7% recovery if the "regular rate" damages analysis is utilized. (Pls.' Br. at p. 8.) Specifically, Plaintiffs state that their maximum actual recovery under the FWW method would be $4.56 million in unliquidated damages. (*Id.*) Including liquidated damages pursuant to the FLSA, therefore, their maximum potential award would be $9.12 million. The proposed $5.2 million settlement thus represents 57% of their potential maximum recovery if the Court determines that the FWW method applies. Further, Plaintiffs represent that if a "regular rate" analysis is performed, the maximum potential recovery in unliquidated damages is $7.95 million, or $15.9 million including liquidated damages. (*Id.*) The proposed settlement thus represents a 32.7% recovery if the Court applies a "regular rate" damages calculation.[4] Although the amount of the settlement representing

---

[4] During the telephonic conference on December 6, 2024, the Court inquired whether the calculation should be based only on the net settlement funds that will be distributed to the plaintiffs, and not the total settlement amount – which includes attorneys' fees and expenses – since the FLSA provides that a plaintiff who is awarded a judgment may also collect, in addition to any judgment, "a reasonable attorney's fee . . . and costs of the action." 29 U.S.C. § 216(b). The best possible recovery to the plaintiffs should they prevail at trial would thus include not only unpaid wages and liquidated damages, but also attorneys' fees and expenses. In their supplemental submission dated December 11, 2024, Plaintiffs note that the Third Circuit and other cases within

unpaid wages to Plaintiffs is less than Plaintiffs may ultimately be awarded at trial, the proposed settlement provides Plaintiffs and the opt-in plaintiffs with a reasonable percentage of their maximum possible recovery of economic damages under the FLSA.[5] *See, e.g., Cruz v. JMC Holdings, Ltd.,* No. 16-9321, 2019 WL 4745284, at *6 (D.N.J. Sept. 30, 2019)(finding settlement that provided 45% of total value of estimated claims if plaintiffs were to fully succeed on merits to be reasonable in FLSA action); *Bodnar*

_____

this district compare the total settlement fund to the best possible recovery in conducting a *Girsh* analysis, without discounting the attorneys' fees and expenses in their analysis. (Letter from Seth R. Lesser, Esq. [D.I. 115], Dec. 11, 2024, p. 4.) Plaintiffs nonetheless state that they identified no case law explaining the reason that courts compare the total settlement fund to the maximum potential recovery. (*Id.* at p. 5.) They note, however, that even if the Court compares the net award to the plaintiffs with the maximum potential recovery, the resulting award is 20.75% to 36.25% of the maximum potential recovery, depending on whether the FWW or "regular rate" damages calculation applies. (*Id.* at p. 6.) Plaintiffs assert that "even these percentages strongly support the conclusion that the proposed settlement is a fair and reasonable result." (*Id.*) The Court agrees.

[5] In addition, Plaintiffs represent that the average gross recovery per person here, in the amount of $6,280.19 per plaintiff, is "on par" with the amounts recovered in other FLSA misclassification cases. (Pls.' Br. at pp. 14, 20.) Plaintiffs further note that this amount is less than the amount recovered per plaintiff in *Goodman* because the time period covered in the *Goodman* settlement included more workweeks than covered in this settlement. (*Id.* at pp. 21-22.) Because a settlement in each case is dependent on the specific facts of the case, including the number of workweeks covered by the settlement, the average recovery per person in other cases does not inform the reasonableness of the settlement here absent further information demonstrating the factual similarity, if any, of each case.

*v. Bank of Am., N.A.*, No. 14-3224, 2016 WL 4582084, at *4 (E.D.
Pa. Aug. 4, 2016)(approving settlement that represented "between
13 and 48 percent of the maximum amount of damages [plaintiffs]
may have been able to secure at trial, without further risks
attendant to litigation"); *Singleton v. First Student Mgmt. LLC*,
No. 13-1744, 2014 WL 3865853, at *7 (D.N.J. Aug. 6,
2014)(settlement "may be appropriate even where the settlement is
only a fraction of the ultimate total exposure should the case be
decided at trial"); *Lenahan v. Sears, Roebuck & Co.*, No. 02-0045,
2006 WL 2085282, at *15-16 (D.N.J. July 24, 2006)(approving $15
million settlement of FLSA action where maximum potential exposure
was $104 million, representing a 14% recovery), *aff'd*, 266 F. App'x
114 (3d Cir. 2008). The parties recognize that continuing with
litigation carries risks for either side in proving or defending
against the claims, and the settlement amount reflects the
uncertainty of future litigation. The Court finds the eighth and
ninth *Girsh* factors support the fairness of the settlement.

In summary, having considered the nine *Girsh* factors,
the Court concludes that the amount of the proposed settlement is
fair and reasonable. If this case was not compelled to arbitration,
it likely would have involved extensive and expensive motion
practice and discovery. No collective members expressed an intent
to opt out of the settlement, the parties had an adequate
appreciation of the merits of the case when negotiating the

settlement, and there was a risk of establishing liability. While Plaintiffs have records to establish damages and there is no evidence that Defendants could not have afforded a higher settlement amount, the settlement amount is reasonable in light of the best possible recovery and all the attendant risks of litigation and in light of the possibility that Plaintiffs may have been compelled to arbitrate or litigate their claims on an individual basis.

In addition to consideration of the amount of compensation that Plaintiffs and the opt-in plaintiffs will receive pursuant to the settlement, the Court must also determine whether the proposed attorneys' fee is fair and reasonable. "An award of attorney's fees is authorized under the FLSA, which provides that the court shall allow 'a reasonable attorney's fee to be paid by the defendant, and costs of the action.'" *Joseph*, 2012 WL 12898816, at *3 (quoting 29 U.S.C. § 216(b)). The Court's obligation to assess the reasonableness of an attorneys' fee when evaluating the reasonableness of an FLSA settlement rests on the presumption that any fee to the plaintiff's counsel is obtained at the plaintiff's expense, because the amount the plaintiff receives in settlement is reduced by the attorney's fee allocation. *See id.* ("Such an inquiry is warranted where a plaintiff receives less than a full recovery, because if certain fees are unreasonable and reduced, Plaintiff's settlement amount would be

24

increased.")(citing *Rodriguez v. Skechers U.S.A., Inc.*, No. 11-
1219, 2012 WL 503877, at *2 n.3 (M.D. Fla. Feb. 14, 2012), *report
and recommendation adopted*, No. 11-1219, 2012 WL 503606, at *1
(M.D. Fla. Feb. 15, 2012)); *see also Silva v. Miller*, 307 F. App'x
349, 351-52 (11th Cir. 2009)("FLSA requires judicial review of the
reasonableness of counsel's legal fees to assure both that counsel
is compensated adequately and that no conflict of interest taints
the amount the wronged employee recovers under a settlement
agreement. . . . To turn a blind eye to an agreed upon contingency
fee in an amount greater than the amount determined to be
reasonable after judicial scrutiny runs counter to FLSA's
provisions for compensating the wronged employee.").

       Plaintiffs here seek to utilize the percentage of
recovery method of calculating attorneys' fees and request one-
third of the gross settlement amount.[6] During the December 6, 2024
conference call, the Court inquired whether the attorneys' fee
should be calculated on the net settlement amount or the gross
settlement amount. In their supplemental submission, Plaintiffs

---

[6] Each of the plaintiffs agreed to a contingency fee arrangement
by signing a Consent to Join form where the notice provided to the
opt-in plaintiffs advised that "Plaintiffs' counsel may move the
Court for up to 1/3 of any such gross settlement amount as a fee
award, as well as for reimbursement of expenses. If you prefer,
you may be represented by your own counsel, at your own expense
and pursuant to terms you work out with such counsel, or you may
proceed without counsel." (Notice of Collective Action Overtime
Lawsuit for Burlington Assistant Store Managers [D.I. 58-1], p.
5.)

assert that they should be awarded attorneys' fees on the gross
settlement amount, citing New Jersey Court Rule 1:21-7(i). (*See*
Letter from Seth R. Lesser, Esq. [D.I. 115], Dec. 11, 2024, p. 3.)
Rule 1:21-7(i) provides, in relevant part, that "[w]hen
representation is undertaken on behalf of several persons whose
respective claims, whether or not joined in one action, arise out
of the same transaction or set of facts or involve substantially
identical liability issues, the contingent fee shall be calculated
on the basis of the aggregate sum of all recoveries, whether by
judgment, settlement or both, and shall be charged to the clients
in proportion to the recovery of each." N.J. CT. R. 1:21-7(i). The
Court notes that New Jersey Court Rule 1:21-7(d), which by its
terms is applicable to cases predicated upon the alleged tortious
conduct of another, provides that attorneys' fees "shall be
computed on the net sum recovered" after deduction of expenses.
N.J. CT. R. 1:21-7(d). Because the court rule expressly provides
for an attorneys' fee on a net recovery in tort actions, and the
provision of the rule applicable to multiple party actions does
not contain a similar limitation, the Court shall award Plaintiffs'
counsel a reasonable attorneys' fee on the gross sum recovered on
behalf of their clients.

> "Under the percentage-of-recovery approach, the Court
must determine whether the percentage of total recovery that the
proposed award would allocate to attorneys['] fees is appropriate

'based on the circumstances of the case.'" *Bredbenner v. Liberty Travel, Inc.*, No. 09-1248, 2011 WL 1344745, at *19 (D.N.J. Apr. 8, 2011)(quoting *In re Cendant Corp. Litig.*, 264 F.3d at 256). In collective action cases, the Third Circuit has set forth several factors a court should utilize in determining whether an award based on the percentage of recovery is appropriate:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted). This list is not exhaustive, and courts may also consider any other factors that are "useful and relevant" under the facts of each case. *Bredbenner*, 2011 WL 1344745, at *19 (quoting *In re AT&T Corp.*, 455 F.3d 160, 166 (3d Cir. 2006)). Courts in the Third Circuit "predominantly use a percentage-of-recovery method to assess attorneys' fees in wage and hour cases where a common fund is established." *Clarke v. Flik Int'l Corp.*, No. 17-1915, 2020 WL 747067, at *3 (D.N.J. Feb. 14, 2020).

The Court first considers the size of the fund created and the number of persons benefitted. "As a general rule, as the size of a fund increases, the appropriate percentage to be awarded

27

to counsel decreases." *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 337 (D.N.J. 2002). "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *In re Prudential*, 148 F.3d at 339 (internal citation omitted). Here, the total common fund is $5.2 million on behalf of 828 individuals. The Court finds the 33 1/3% attorney's fee in this case reasonable in light of the size of the settlement fund and the number of opt-in members who benefit from counsel's efforts in this case.

The Court next considers the presence or absence of substantial objections by collective members to the settlement terms and/or requested attorneys' fees. As noted above, Plaintiffs' counsel provided notice of the proposed settlement to all opt-in collective members and requested that the opt-in members ask questions or advise of an intent to opt out of the settlement, yet there has been no indication that any opt-in members intend to opt out of the settlement. The absence of any objections by collective members to the proposed settlement weighs in favor of approving the fee request.

In considering the skill and efficiency of the attorneys involved, Plaintiffs' counsel has considerable experience handling collective action disputes. In this regard, Plaintiffs' counsel

has submitted declarations from other attorneys that outline the qualifications and relevant experience of the lead attorneys who worked on this matter. (*See* Decl. of Shanon J. Carson in Support of Pls.' Unopposed Mot. for an Award of Attorneys' Fees [D.I. 111-5], Nov. 1, 2024, p. 5, ¶¶ 12-13; Decl. of Stephen DeNittis, Esq. in Support of Pls.' Unopposed Mot. for an Award of Attorneys' Fees [D.I. 111-6], p. 9, ¶ 10; Cert. of Andrew M. Milz, Esq. in Support of Pls.' Unopposed Mot. for an Award of Attorneys' Fees [D.I. 111-7], Oct. 28, 2024, pp. 6-7, ¶ 13; Decl. of Lisa J. Rodriguez in Support of Pls.' Unopposed Mot. for an Award of Attorneys' Fees [D.I. 111-8], Nov. 1, 2024, pp. 3-4, ¶¶ 3-4; Decl. of Peter Winebrake in Support of Pls.' Unopposed Mot. For an Award of Attorneys' Fees [D.I. 111-9], Nov. 5, 2024, p. 3, ¶ 8; Decl. of Andrew Wolf in Support of Pls.' Mot. for an Award of Attorneys' Fees [D.I. 111-10], Oct. 28, 2024, p. 6, ¶¶ 16-17.) Furthermore, counsel has worked efficiently to achieve a favorable result for the collective. Therefore, this factor also favors approval of the requested fee.

The *Gunter* factors also include consideration of the complexity and duration of the litigation. In this case, as set forth above, the parties negotiated a settlement before conducting discovery, and the case does not appear to have been particularly complicated at this stage, especially given that Plaintiffs' counsel previously litigated the *Goodman* case and was, as

Plaintiffs' counsel states, "fully aware of the claims and defenses presented and knew that the policies and procedures applicable to the claims had not changed[.]" (Pls.' Supp. Letter at p. 3.) As to duration, this case was filed less than three years ago. Therefore, this factor is neutral.

The Court next considers the risk of nonpayment and the amount of time devoted to the case by counsel. Plaintiffs' counsel took this case on a contingent fee basis, and counsel states that they assumed "a substantial risk that they might not be compensated at all for their efforts, particularly since . . . as many FLSA misclassification cases are lost at trial as are won and, in this instance, this case was commenced in the face of a known arbitration/collective waiver." (Pls.' Br. at p. 29.) Accordingly, there was a risk of nonpayment if Plaintiffs did not prevail. Further, Plaintiffs' counsel represents that "as of July 15, 2024, Plaintiffs' counsel have put in 1015.64 hours of work[.]" (*Id.* at p. 30.) These factors accordingly support a fee award in the amount of 33 1/3%.

Finally, in comparing this fee request to awards in similar cases, the Court finds that a 33 1/3% fee award is consistent with other awards in this District. *See, e.g., Pullinger v. Arther R. Todd Elec. Contractor, Inc.*, No. 22-268, 2022 WL 4974816, at *3 (D.N.J. Oct. 4, 2022) ("thirty-six percent award with a 1.32 lodestar multiplier is consistent with the award of

attorneys' fees in FLSA in the Third Circuit, which ranges from roughly 20-45%"); *Brumley,* 2012 WL 1019337, at *12 ("Counsel's request for one-third of the settlement fund falls within the range of reasonable allocations in the context of awards granted in other, similar cases."); *In re Staples Inc. Wage & Hour Emp. Pracs. Litig.*, No. 10-1278, 2011 WL 5413221, at *4 (D.N.J. Nov. 4, 2011)(approving a 27.5% attorneys' fee for FLSA misclassification case). Accordingly, the percentage fee requested by Plaintiffs' counsel here does not appear to be disproportionate to other percentage of recovery fee awards in similar cases, thus supporting the requested fee.

Having considered all of the *Gunter* factors, the Court finds it appropriate to award a fee based on a percentage of the recovery obtained for the class and that the requested fee award in the amount of 33 1/3% of the common fund is reasonable. As set forth above, Plaintiffs' counsel took this case on a contingent basis at the risk of non-payment and faced with a potential arbitration bar. Moreover, counsel reached a settlement that benefited 828 people, and counsel represents that none of the opt-in plaintiffs expressed an intent to opt out of the settlement. The percentage of the fee award is also in line with awards in similar cases.

Although the Court concludes that the attorneys' fees are reasonable in light of the *Gunter* factors, the Court must also

cross-check the result by applying the lodestar method. *Bredbenner*, 2011 WL 1344745, at *19 ("the Third Circuit has suggested that courts 'cross-check' [a] fee calculation against the lodestar award method")(citing *Gunter*, 223 F.3d at 195 n.1). "[T]he lodestar method of calculating fees . . . computes the reasonable hours expended by counsel multiplied by a reasonable hourly rate, then adjusts up or down to account for case-specific variables." *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 721 (3d Cir. 2023). A multiplier is "[a]n increase or decrease of the lodestar amount" that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305-06 and n.13. "In performing the lodestar cross-check, the [court] should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Id.* at 306.

Plaintiffs have calculated their fees under the lodestar method. Based on a total number of 1015.64 hours, at rates ranging from $450 to $1150 per hour for attorney time and $120 to $330 for assistant time, the lodestar figure is $797,484.70. (Pls.' Br. at p. 30.) Plaintiffs' counsel has provided a declaration listing the attorneys and staff who billed time in this case, along with each individual's position, years of experience, hourly rate, and total hours billed. (Lesser Decl. at pp. 11-13, ¶ 17.) Plaintiffs'

counsel represents that the blended rates are $824 per hour for the Javerbaum law firm and $775 per hour for the Klafter Lesser law firm. (Pls.' Supp. Letter at p. 13.) Furthermore, Plaintiffs have provided declarations from attorneys within the community engaged in similar practices who confirm that the hourly rates sought by counsel here are reasonable. Although counsel's requested percentage-based fee of $1,733,333 is approximately double the lodestar amount, "[t]he Third Circuit has [] recognized that multipliers 'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 256 (D.N.J. 2005)(internal quotation omitted). In light of the risks of non-payment and potential bar to recovery in this litigation as discussed above, the Court finds a 2.17 multiplier is within a reasonable range. Moreover, as noted by Plaintiffs, counsel will spend additional hours to effectuate the administration of the settlement and advise opt-ins regarding their settlement payments, which counsel estimates to be 150 hours. (Pls.' Br. at p. 30 n. 20.) Thus, the Court concludes that a lodestar cross-check confirms that the proposed 33 1/3% fee award is fair and reasonable under the circumstances. For this reason and for the reasons set forth

above, the Court will approve an attorneys' fee in the amount of
33 1/3% of the gross settlement amount.[7]

The Court next considers whether the proposed settlement
agreement frustrates the implementation of the FLSA in the
workplace. "Indicia of a compromise which runs counter to the
FLSA's purpose of protecting workers include restrictive
confidentiality clauses and overly broad release provisions."
*Fritz*, 2020 WL 5015508, at *2 (citing *Brumley*, 2012 WL 1019337, at
*2). The proposed settlement agreement here contains both a
confidentiality clause and release provisions.

With respect to the confidentiality clause, "district
courts have rejected as unreasonable settlement agreements that

---

[7] By Order dated October 28, 2024, the Court required additional
information concerning the "clear sailing" provision and the
reversionary provision in the settlement agreement. (Order [D.I.
109], Oct. 28, 2024, p. 11.) The parties have since agreed to
eliminate the reverter as to uncashed checks, and any uncashed
funds "will be redistributed to those Opt-Ins who did cash or
deposit their checks, to the extent they would receive at least
$20.00[,]" thereby addressing the Court's concern with respect to
the reversionary provision. (Pls.' Supp. Letter at p. 18.) Further,
Plaintiffs represent that there will be no reversionary funds that
cannot be redistributed. (Letter from Seth R. Lesser, Esq. [D.I.
115], Dec. 11, 2024, p. 3.) In addition, Plaintiffs explain that
the amount of the settlement was negotiated without regard to the
amount of attorneys' fees and was negotiated through a third-party
mediator in an arms' length negotiation, such that "there could
not have been any explicit or implicit trade-off of the
collective's interests for counsel's interests, which is the
concern behind clear sailing agreements." (Pls.' Supp. Letter at
p. 3.) In light of counsel's representations, the Court finds no
basis to conclude that the clear sailing provision is the result
of collusion between counsel.

contain confidentiality provisions, finding them unenforceable and operating in contravention the FLSA." *Brumley*, 2012 WL 1019337, at *7. "By including a confidentiality provision, the employer thwarts the informational objective of the notice requirement by silencing the employee who has vindicated a disputed FLSA right[.]" *Id.* (quoting *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1242-47 (M.D. Fla. 2010)). Thus, "[t]here is a strong presumption against confidentiality clauses in FLSA wage-settlement agreements." *Haley v. Bell-Mark Techs. Corp.*, No. 17-1775, 2019 WL 1925116, at *5 (M.D. Pa. Apr. 30, 2019).

However, "[d]istrict courts within the Third Circuit have occasionally approved narrowly crafted confidentiality clauses." *Id.* at *6. In such cases, the confidentiality clauses "restricted employees only from disparaging their employers and discussing the terms of the settlement with the press and media," but the settlement agreements remained publicly accessible and employees were permitted to discuss the settlement terms with co-workers. *Id.* In *Alvarez v. BI Inc.*, No. 16-2705, 2020 WL 1694294, at *9 (E.D. Pa. Apr. 6, 2020), for example, the court approved a settlement even though a confidentiality provision barred the plaintiffs from discussing the case with the media, finding that "[i]mplementation of this clause would not frustrate the purpose of the FLSA because the clause" did not otherwise bar the

35

plaintiffs "from discussing the lawsuit with the employees of Defendant."

Here, the confidentiality clause prohibits Plaintiffs and their counsel from initiating communication with the media about the settlement but does not preclude Plaintiffs or the opt-in plaintiffs from speaking with co-workers about the settlement agreement. Moreover, the settlement agreement and all filings in this case are publicly available and the parties do not seek to seal the record. Consequently, the Court finds that the limited confidentiality provision is not so unduly restrictive as to frustrate the purpose of the FLSA.

The Court notes that the settlement agreement also contains release provisions. As to the opt-in Plaintiffs, the releases are limited to the specific claims that are the subject of this lawsuit.[8] Such releases are permissible in FLSA settlement

---

[8] The release provides: "Upon the Effective Date and in consideration of all payments made by Burlington, their eligibility to claim their allocated Settlement Payment, and any other relief described herein, Plaintiffs and Participating Collective Members will release any and all wage and hour claims, rights, and causes of action, whether known or unknown, under any federal, state, or local wage and hour law, including but not limited to the Fair Labor Standards Act, including without limitation statutory, constitutional, contractual, and common law claims for wages, damages, penalties, attorneys' fees, restitution, or equitable relief to the extent relating to or deriving from the claims for overtime wages or from the facts alleged in the Amended Complaint against the Released Parties during the Relevant Time Period (the 'Participating Collective Members' Released Claims'). The Participating Collective Members' Released Claims will not include any presently pending claim by

agreements. *See Cruz,* 2019 WL 4745284, at *7 ("district courts require plaintiffs to limit the scope of any waiver or release clause in FLSA settlement agreements to 'claims related to the specific litigation'")(quoting *Singleton*, 2014 WL 3865853, at *9); *see also Brumley*, 2012 WL 1019337, at *8 ("The Supreme Court and lower courts have consistently rejected broad waivers of FLSA rights[.]").

However, the Court rejects the general release provision for the named Plaintiffs. The release proposed for the named Plaintiffs provides that they "will release any and all claims and causes of action, whether known or unknown, that they may have against any and all of the Released Parties (as defined herein) from the beginning of time through the date the General Release is signed." (Pls.' Supp. Letter, Ex. A at pp. 2-3, ¶ 6.) Pursuant to the proposed release, the claims to be released by the named Plaintiffs include "wage and hour claims, contract claims; claims for salary, incentive payments, benefits, bonuses, restricted

---

them, other than this Lawsuit, asserted against the Released Parties as of the date of the execution of the Settlement Agreement. The Parties agree that in the Notice, the Opt-In Plaintiffs will be informed of the effect of this release if they become a Participating Collective Member and that this release will also be provided to Participating Collective Members with their Settlement Checks. The Parties intend and agree that the Final Approval Order and Judgment and this Settlement shall have *res judicata* and preclusive effect to the fullest extent allowed by law as to Participating Collective Members." (Lesser Decl., Ex. A at p. 8, ¶ 7.)

stock awards, stock options, severance pay, commissions, or vacation pay; claims sounding in negligence or tort; fraud claims; claims for medical bills; all matters in law, in equity, or pursuant to statute, including damages, attorneys' fees, costs, and expenses; and, without limiting the generality of the foregoing, to all claims, including but not limited to, those arising under the Fair Labor Standards Act; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Americans with Disabilities Act; 42 U.S.C. § 1981; the Age Discrimination in Employment Act (if applicable); the Older Workers' Benefit Protection Act (if applicable); the Employee Retirement Income Security Act; the Genetic Information Nondiscrimination Act; the Family and Medical Leave Act; the wage/hour laws and regulations of any state; and any other federal, state or local law, statute, or ordinance affecting [the named Plaintiffs'] employment with Burlington and any interactions with any of the Released Parties[.]" (*Id.*)

Releases in FLSA settlement agreements by which a plaintiff-employee waives claims unrelated to the subject litigation and future or unknown claims are "routinely rejected in the Third Circuit." *Hudson v. Express Transfer & Trucking*, No. 20-5771, 2021 WL 406450, at *5 (D.N.J. Feb. 5, 2021)(citations omitted); *see also Kraus*, 155 F. Supp. 3d at 532 (rejecting release of any and all claims that accrued to date of execution of

38

release). Indeed, Plaintiffs recognized in their brief that "courts can be wary of general releases in FLSA settlements[,]" but they asserted that a general release is appropriate here because each named plaintiff will receive $10,000 as a service award in addition to their FLSA payment. (Pls.' Br. at pp. 24-25.) The Court sought additional briefing on this issue because the service awards were purportedly "to compensate the named plaintiffs for their time and effort in connection with this litigation and not as consideration for executing a general release." (Order [D.I. 109], Oct. 28, 2024, p. 12.) In their supplemental submission, Plaintiffs represent that the parties "agreed to eliminate conditioning the Service Awards on providing a General Release" but note that the "Named Plaintiffs are still required to provide a General Release [which] . . . now requires that Burlington also provide, in turn, a general release to the Named Plaintiffs." (Pls.' Supp. Letter at p. 20.)

The Court notes that "[i]n some circumstances, if the general release contains additional consideration to the plaintiff, up to and above what he or she is entitled to under the FLSA, the general release is enforceable." *Vega v. Ya Guan USA LLC*, No. 19-24902, 2021 WL 8946186, at *2 (S.D. Fla. Aug. 24, 2021). However, "[m]utual general releases add little to the fairness analysis without information in the settlement agreement outlining the value of the claims being relinquished by both

39

employer and employee." *Buntin v. Square Foot Mgmt. Co., LLC*, No. 14-1394, 2015 WL 3407866, at *3 (M.D. Fla. May 27, 2015). "[T]he extraction of concessions on amounts owed under the FLSA in exchange for an employer agreeing to forego a heretofore uncontemplated right to sue the employee on the way out the door would not add much to the value side of the ledger for the employee." *Id.; see also Moutrey v. Fort Lauderdale Transportation, Inc.*, No. 17-60211, 2017 WL 7805572, at *2 (S.D. Fla. Apr. 19, 2017)("Although the general release is mutual, the parties' Motion contains no detail illustrating its value to Plaintiff" by reference to, for example, "particular claims Defendant would otherwise have had against Plaintiff that would be foreclosed under the release."). "Absent some knowledge of the value of the released claims, the fairness of the compromise remains indeterminate." *Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1352 (M.D. Fla. 2010).

During the December 6, 2024 conference, the Court requested additional information concerning the nature of the claims being released by the parties. By letter dated December 13, 2024, Defendants' counsel represents that "[n]either party is aware of any specific additional claims the other(s) may have, and each perceives value in obtaining a general release." (Letter from August W. Heckman, III, Esq. [D.I. 116], Dec. 13, 2024, p. 1.) Defense counsel further represents that none of the named

plaintiffs are presently employed by Defendants, and the proposed mutual releases "ensure a full and final resolution of any and all differences/claims amongst and between the parties." (*Id.*) Defense counsel requests, however, that if the Court declines to enforce the mutual general releases, that the Court strike such provision, such that each named plaintiff would only provide a specific release as set forth above. (*Id.* at p. 2.) In light of the above-cited authority concerning general releases, and given that none of the parties are aware of any additional claims, the Court finds little value in the mutual releases and will therefore strike this provision from the settlement agreement. The named plaintiffs shall be subject only to the same specific release applicable to the opt-in plaintiffs.

With respect to the proposed method for disbursement of the settlement funds, the Court finds the proposed notice is sufficient. The notice describes the terms of the settlement, including the method of calculating the damages, the amount to which each opt-in plaintiff is entitled, the scope of the release, and the payment of attorneys' fees and costs.

With respect to the request for approval of $10,000 service awards to each of the named Plaintiffs, the Court finds that a service award to these plaintiffs is appropriate. "Service payments are fairly common in class action lawsuits involving a common fund for distribution to the class." *Bredbenner*, 2011 WL

1344745, at *22. "Courts have ample authority to award incentive or 'service' payments to particular class members where the individual provided a benefit to the class or incurred risks during the course of litigation." *Id.* at *23. "The purpose of these payments is to compensate named plaintiffs for 'the services they provided and the risks they incurred during the course of class action litigation,' and to 'reward the public service' of contributing to the enforcement of mandatory laws[.]" *Id.* at *22 (internal citation omitted).

Here, the basis of the service award payments is that the named Plaintiffs were actively involved in the litigation, provided the information and documents that formed the basis of the lawsuit, were willing to assume the risk associated with being a named plaintiff, and provided Plaintiffs' counsel with information to participate in mediation and obtain conditional certification. (Lesser Decl. at pp. 15-17, ¶ 20.) The benefits to all opt-in plaintiffs under the settlement agreement are therefore a direct result of the services rendered by named Plaintiffs. Furthermore, the amount of the requested service award is consistent with awards in other collective actions in the Third Circuit. *See Chludzinski v. NWPA Pizza, Inc.,* No. 20-163, 2022 WL 22887067, at *11 (W.D. Pa. Jan. 6, 2022)(approving $10,000 service award to named plaintiff); *Dominguez v. Galaxy Recycling Inc.,* No. 12-7521, 2017 WL 2495406, at *9 (D.N.J. June 9, 2017)(same); *Brown*

*v. Progressions Behav. Health Servs., Inc.*, No. 16-6054, 2017 WL 2986300, at *7 (E.D. Pa. July 13, 2017)(same); *Bredbenner*, 2011 WL 1344745, at *24 (approving $10,000 service award to each of eight named plaintiffs).

Plaintiffs' counsel also seeks reimbursement of $116,534.10 for expenses. As noted above, the FLSA expressly provides for repayment of costs. *See* 29 U.S.C. § 216(b)("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."). Plaintiffs' counsel contends that they incurred $51,259.10 in costs associated with court fees, mediation, legal research, and to provide notice to putative collective members. (See Lesser Decl. at p. 14, ¶ 19.) Plaintiffs' counsel represents that these expenses are reflected on the books and records of counsel and constitute "out-of-pocket monetary expenses from the beginning of the case[.]" (*Id.*) Further, Plaintiffs seek up to $65,275, the amount of the settlement administrator's capped proposal for the costs of settlement administration, including the printing of the notice and checks, mailing such documents to Opt-Ins, dealing with replacement checks and remailings, and tax reportings. (Pls.' Br. at p. 37.) The Court finds that the expenses are reasonable and appropriate in this case and therefore approves the requested expenses.

43

Lastly, the Court considers Plaintiffs' request that $15,000 of the proposed settlement funds be allocated to the PAGA claim. "By its terms, PAGA authorizes any 'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or herself and other current or former employees' to obtain civil penalties that previously could have been recovered only by the State in [a California Labor and Workplace Development Agency ("LWDA")] enforcement action." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 644 (2022)(quoting Cal. Lab. Code Ann. § 2699(a)). "PAGA claims are intended to serve . . . to protect the public rather than for the benefit of private parties." *Tenorio v. Gallardo*, No. 16-283, 2019 WL 4747949, at *2 (E.D. Cal. Sept. 30, 2019).

"'[B]ecause a settlement of PAGA claims compromises a claim that could otherwise be brought by the state,' . . . the Act also requires that a court 'review and approve any settlement of any civil action filed pursuant to [the Act].'" *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019)(quoting *Ramirez v. Benito Valley Farms, LLC*, No. 16-04708, 2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017)). "There is no definitive standard for approval of a PAGA settlement." *Perez v. Bodycote Thermal Processing, Inc.*, No. 22-00145, 2024 WL 4329063, at *8 (C.D. Cal. Feb. 21, 2024). "Nonetheless, courts routinely approve PAGA settlements if (1) the statutory requirements set

44

forth by PAGA have been satisfied, and (2) the settlement agreement is fair, reasonable, and adequate in view of PAGA's public policy goals." *Eisenacher v. VITAS Hospice Servs., LLC*, No. 20-04948, 2021 WL 1846574, at *2 (N.D. Cal. Apr. 2, 2021). "Moreover, '[a] party seeking approval of a PAGA settlement must simultaneously submit the proposed settlement to the [LWDA] to allow the LWDA to comment on the settlement if the LWDA so desires.'" *Haralson*, 383 F. Supp. 3d at 971 (quoting *Ramirez*, 2017 WL 3670794, at *2).

Plaintiffs represent that the value of the California opt-in plaintiffs' claims is $174,747.57 and that the maximum PAGA penalties recoverable under California Labor Code § 2699(f)(2) is approximately $374,000. (Letter from Seth R. Lesser, Esq. [D.I. 115], Dec. 11, 2024, p. 6.) Plaintiffs also represent that the there are eighty-one opt-in plaintiffs who are covered by the PAGA settlement, which is 9.8% of the number of opt-in plaintiffs in this action, that these California plaintiffs worked overtime during 6% of the workweeks during the relevant time period, and that the PAGA settlement represents 4% of the maximum PAGA penalties recoverable under California law. (*Id.*) Plaintiffs contend that this percentage is higher than amounts approved by other courts and argue that this amount, while limited, is justified because it "maximizes the funds provided directly to the impacted California employees." (Pls.' Br. at p. 36.) Plaintiffs also note that Defendants "stopped the current and future alleged

45

violations over three years ago," and consequently "there is no
need for a greater PAGA Payment now" because the purpose of a
penalty under PAGA is to stop current and future violations.
(Letter from Seth R. Lesser, Esq. [D.I. 115], Dec. 11, 2024, p.
7.)

As noted above, the purpose of PAGA is to protect the
public and not the individual aggrieved employees. Nonetheless,
courts have recognized that when labor claims are combined with
PAGA claims, "by providing fair compensation to the class members
as employees and substantial monetary relief, a settlement not
only vindicates the rights of the class members as employees, but
may have a deterrent effect upon the defendant employer and other
employers, an objective of PAGA*." O'Connor v. Uber Techs., Inc.*,
201 F. Supp. 3d 1110, 1134 (N.D. Cal. 2016). "Likewise, if the
settlement resolves the important question of the status of workers
as employees entitled to the protection of the Labor Code or
contained substantial injunctive relief, this would support PAGA's
interest in 'augmenting the state's enforcement capabilities,
encouraging compliance with Labor Code provisions, and deterring
noncompliance.'" *Id.* at 1134-35 (internal citation omitted).

Plaintiffs submitted the settlement agreement to the
California Labor and Workplace Development Agency (*see* Pls.' Br.
at p. 35 n. 23), and there is nothing in the record to date that
indicates that LWDA intends to investigate or otherwise intervene

46

in the settlement of the PAGA claims in this lawsuit, which weighs in favor of approval. *Valadez v. CSX Intermodal Terminals, Inc.*, No. 15-05433, 2020 WL 13179429, at *2 (N.D. Cal. May 13, 2020)("the lack of an objection by the agency [] weigh[s] in favor of approval"). The proposed payment also comports with section 2699(i) of the California Labor Code, which sets forth the method for distributing civil penalties recovered by employees on a PAGA claim and provides that 75% of the PAGA proceeds ($11,250) must be distributed to the LWDA, and the remaining 25% of the PAGA proceeds ($3,250) distributed to the aggrieved employees. The Court also recognizes that "courts have raised concerns about settlements of less than 1% of the total value of a PAGA claim[,]" *Jennings v. Open Door Mktg., LLC*, No. 15-04080, 2018 WL 4773057, at *9 (N.D. Cal. Oct. 3, 2018), but the settlement here represents more than a 4% recovery. Finally, the Court notes Plaintiffs' representation that Defendants have stopped their alleged violations of California labor law, and consequently there is no need for a greater penalty to stop continued purportedly wrongful conduct. The Court concludes that the settlement of the PAGA claim is fair, adequate and reasonable under the circumstances presented here.[9]

---

[9] The Court notes that in the *Goodman* case, the Court approved a $19,613,900 settlement, which similarly included a $15,000 allocation for the PAGA claims in that case. (*See* Final Approval Order and Judgment [D.I. 477 in Civil No. 11-4395], Dec. 15, 2020; Settlement Agreement [D.I. 472-3 in Civil No. 11-4395], pp. 2, 4.)

In summary, the Court shall grant Plaintiffs' motion for settlement approval. The Court finds the amount of the settlement fair and reasonable under the circumstances and will approve the settlement proposed by the parties, as revised in the submissions of Plaintiffs, subject to striking of the mutual general release and application of a specific release.

An Order and Judgment consistent with this Opinion will be entered on this date.


Dated: December 23, 2024          s/ Ann Marie Donio
                                  _____
                                  ANN MARIE DONIO
                                  UNITED STATES MAGISTRATE JUDGE

At Camden, New Jersey